STATE of Missouri, Respondent,

v.

Stevie B. ELDER, Appellant.

Stevie B. ELDER, Appellant,

v.

STATE of Missouri, Respondent.

Nos. WD 46037, WD 48529.

Missouri Court of Appeals,
Western District.

April 4, 1995.

Motion for Rehearing and/or Transfer to
Supreme Court Denied May 30, 1995.

Application to Transfer Denied
July 25, 1995.

Laura G. Martin, Asst. Appellate Defender, Kansas City, for appellant.

Philip M. Koppe, Asst. Atty. Gen., Kansas City, for respondent.

Before SPINDEN, P.J., and ULRICH and SMART, JJ.

SPINDEN, Presiding Judge.

Stevie B. Elder appeals his conviction and 10 year sentence for selling a controlled substance. He asserts that the trial court erred in refusing to require the state to give a race-neutral reason for the trial court's subsequent striking of the last venire person on the jury list. He also appeals the denial of his Rule 29.15 motion; he contends he was denied effective assistance of counsel. We affirm the judgments of conviction and denial of his Rule 29.15 motion.

Elder was convicted of selling crack cocaine to a Kansas City undercover police officer on February 23, 1991. Steve Campo, a member of the Kansas City Police Department's street narcotics unit, was working with Detective Gale Hall when they drove by a residence at 423 Paseo at about 10:00 P.M. Elder was standing in front of the residence and motioned for Campo to pull his car to the curb. When Campo did, Elder ran to Campo's window and asked, "[H]ow much ...?" Campo answered, "[A] twenty." This meant $20 worth of crack cocaine. Elder reached into his pocket and pulled out a "rock" of crack and gave it to Campo who handed Elder a $20 bill. Officers had previously photocopied the bill. A chemical analysis of the "rock" revealed that it was 9 percent cocaine.

At the time of the drug buy, two female prostitutes approached the passenger's side of Campo's car and struck up a conversation with Hall. A third woman stood behind Elder on the driver's side of the car. Campo did not see any black males other than the man who sold him the cocaine, and he did not see anyone playing a dice game.

Campo described the person who sold him the crack as having a height of five-foot-six-inches to six feet, weighing 170 to 210

pounds, and being between 21 and 27 years of age. He said that the person wore a blue coat, blue jeans, and a blue sweatshirt with the emblem "Putt Putt Golf" on it.

When Campo and Hall drove off, they notified the Street Narcotics Unit Tactical Response team on their radio that the transaction had occurred. An unmarked, unit van immediately drove to 423 Paseo. Detective Cord Laws jumped from the van and apprehended Elder. As Elder was being arrested, he threw down a plastic bag containing a beige, rock-like substance which turned out to be B vitamin.

After Elder was arrested, Campo and Hall returned to the scene. Campo identified Elder as the person from whom he had purchased the crack. Elder matched the physical description given by Campo, including the clothing description. Officers, in searching Elder incident to his arrest, found on Elder the $20 bill which Campo had given Elder minutes earlier in exchange for the crack. Elder possessed no other money. Campo did not see any other black males in the area.

At trial, Elder testified that he was at the address with a friend, Maurice Thompson, to play a dice gambling game. He said that seven or eight other men played. Two of them, he said, were drug dealers. He said that as they played, a girl working for one of the drug dealers approached persons driving by in cars to offer what appeared to be narcotics. After making a sale, Elder said, the girl gave the money to one of the drug dealers.

When the police arrived, Elder said, someone yelled, "Police." He said that he and the other players fled. He said that he picked up about $45 of gambling money from the sidewalk and ran north on Paseo. He said he was running back toward Thompson's car when officers arrested him.

█ In his first point on appeal, Elder contends that the trial court erred in overruling his objection to the state's using one of its peremptory strikes to remove a black male from the jury. He asserts that the trial court erred in failing to require the state to offer a race-neutral explanation for the strike. A party's reliance on race as the

basis for a peremptory challenge offends U.S. CONST. amend XIV. *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

At the conclusion of *voir dire*, the trial court had this discussion with attorneys about the peremptory strike:

THE COURT: First let the record show it was called to my attention by the bailiff that the State did not exercise all six of its strikes, stopping with five. And under the law, I believe, the court is compelled to strike the last juror on the list, which in this case is [J.C.]; incidentally, this was presented to me after the defendant had made their strikes. I didn't know that the State had just used five until the defendant also exercised their sixth strike, right?

[ELDER'S ATTORNEY]: That's my understanding of our procedure.

THE COURT: The Court is striking the last juror on the list which is my recollection of what the law is.

[ELDER'S ATTORNEY]: For the record, we enter our objection under the Equal Protection Clause, the Fourteenth Amendment of the Constitution of the United States under Article 1, Section 2 of the Missouri Bill of Rights and also under the Due Process Clause of the 14th Amendment to the Constitution of the United States in Article 1, Section 10 of the Missouri Bill of Rights, in that we feel that the striking of [J.C.], a black person, by this procedure amounts to a deliberate exercise of a peremptory strike by the State which is guaranteed under the procedural law of Missouri to remove a person of African–American heritage.

We think that we have the same objection to the removal of [J.C.] that we would have to the overt exercise of a peremptory strike by the State against someone also black with a lower venire number. By chance, his venire number places him at the end of the list of acceptable and possible jurors. We think that a better procedure which removes any possibility of race motivated striking by the State of Missouri would be to take five minutes, prepare 25 small slips of paper, write the names of each acceptable juror including [J.C.] on a

slip of paper so prepared, to put them all in a hat and to draw one out. We think that would absolutely remove any appearance of impropriety as well as solve the problem as a deliberate use by the State of the procedural law of Missouri to strike a juror without incurring the possible liability of the reversal of a trial conviction on grounds based on Batson versus Kentucky[, 476 U.S. 79 (1986)].

THE COURT: I didn't even notice that Juror No. 33 is black.

[ELDER'S ATTORNEY]: But you do so notice now, sir, for the record.

THE COURT: Yes, uh-huh.

[STATE'S ATTORNEY]: The whole list is randomly generated anyway, including the order of the persons on the panel[,] and there are a number of black persons who were seated in the jury box, and the whole thing is random. That's the point, and a lot of the people that the State would have removed peremptorily were removed for cause. And to be quite honest, we had a tough time coming up with more than two. So I don't think there is any hidden agenda by the State.

THE COURT: As I look at the list, there remains four black jurors on the panel of 12.

[ELDER'S ATTORNEY]: We acknowledge that also and suggest that the rule of Batson as interpreted in case law is that it matters not how many persons of a cognizable group are left on a jury. If there is a racially motivated strike exercised by the State against any one person who is removed by that strike, that that violates Batson and the Fourteenth Amendment and requires a reversal of a case.

THE COURT: I don't believe that the State has neglected to take their six strikes to put the court into the position of striking a black juror. I don't know. That's the position under the law that I'm in.

[STATE'S ATTORNEY]: Quite honestly, we had trouble coming up with more than two strikes.

THE COURT: All right. That's the law as I know it, when one or both parties refuses to make the strikes, the court takes the strikes from the bottom of the list. So that's what I've done. Let the appellate court worry about it.

■ Elder, in essence, requests this court to find that the state was obligated to provide a race-neutral reason for the removal of a prospective juror which it did not strike. As this court's Southern District has said:

> The right to exercise peremptory challenges in a criminal case is a right which may be waived either by the State or by the defendant, where a fair opportunity has been given to exercise it; and where ... the defendant is in no way hindered in the free exercise of his peremptory challenges, the State's action could not affect him prejudicially.

*State v. Supinski*, 378 S.W.2d 602, 605 (Mo. App.1964) (footnote omitted).

In this case, the state's decision to use only five of its six available peremptory strikes did not hinder Elder's free exercise of his peremptory challenges. Further, the United States Supreme Court did not declare in *Batson* that a party must provide a race-neutral reason for removing a juror it does not, in fact, exclude by the use of a peremptory strike. The trial court—not the state—removed the juror.

■ Moreover, the state offered a race-neutral reason for its action: It had difficulty finding more than two jurors it wanted to strike. If the prosecutor articulates a race-neutral reason, the defendant must prove that the state's proffered reasons were pretextual and were, in fact, racially motivated. *State v. Gray*, 887 S.W.2d 369, 383–84 (Mo. banc 1994), *petition for cert. filed*, (Feb. 17, 1995). "In determining whether a defendant has carried the burden of proving purposeful discrimination, the trial court should view the plausibility of the state's explanations in light of the totality of the circumstances of the case." *State v. Aziz*, 861 S.W.2d 803, 805 (Mo.App.1993). The court should deem a prosecutor's explanation to be race-neutral "unless a discriminatory intent is inherent in the explanation." *State v. Pullen*, 843 S.W.2d 360, 362 (Mo. banc 1992), *cert. denied*, —— U.S. ——, 114 S.Ct. 200, 126 L.Ed.2d 158 (1993).

■ Trial courts are vested with considerable discretion in determining the plausibility of the prosecutor's reasons and whether the prosecutor purposefully discriminated in exercising peremptory strikes. *Gray*, 887 S.W.2d at 384. " 'To be sufficient, the explanation need only be race-neutral, reasonably specific and clear, and related to the particular case to be tried.' " *Id.* (citation omitted). To be reversible error, a trial court's decision to accept a prosecutor's explanation of his or her peremptory strike must be clearly erroneous. *State v. Shurn*, 866 S.W.2d 447, 456 (Mo. banc 1993), *cert. denied*, — U.S. —, 115 S.Ct. 118, 130 L.Ed.2d 64 (1994). If the record indicates that the state acted deceptively or with ill-motive, the Fourteenth Amendment is implicated. We discern no basis for concluding that the trial court abused its discretion in this case in accepting the state's explanation for its action and in deciding that it could employ the local rule to strike the last juror on the list rather than use some other method of randomly removing a juror.

■ In his second point, Elder complains that the motion court clearly erred in denying his Rule 29.15 motion for post-conviction relief because he established that his trial attorneys were ineffective. He complains that his trial attorneys did not object to a portion of the state's closing argument. Elder contends that the state attempted to shift the burden of proof to him by suggesting that he was concealing a crucial witness who could establish his innocence. We disagree.

During closing argument, the state said:

Where is Maurice Thompson? We can't call any of those people. We can't present them to you in evidence and show you that they are telling the truth about this crap game on this night in February. He was concerned about Mr. Elder getting arrested and brought him a blue jacket so he wouldn't be cold at the police station.[1] Where is Maurice Thompson? Why haven't we heard from him? Why haven't we heard from him about the blue jacket that

Mr. Elder was trying so desperately to explain.

Elder asserts that it was improper for the state to comment on his not calling Thompson as a witness because Thompson was not "peculiarly available" to Elder and because Thompson's testimony would not have been relevant. He contends that because the state's argument was improper, his attorneys were ineffective for not objecting to the argument.

■ Our review of the denial of a post-conviction motion is limited to determining whether the motion court's findings of fact and conclusions of law were clearly erroneous. *State v. Nolan*, 872 S.W.2d 99, 104 (Mo. banc 1994). We will not declare findings and conclusions to be clearly erroneous unless we have a definite and firm impression that the motion court erred. *Id.*

■ To prevent Elder from converting unpreserved error into viable error in a basis for post-conviction relief, we search the whole record for evidence demonstrating that his attorneys were, overall, incompetent. *Jones v. State*, 784 S.W.2d 789, 793 (Mo. banc), *cert. denied*, 498 U.S. 881, 111 S.Ct. 215, 112 L.Ed.2d 175 (1990). That an attorney does not object to everything objectionable does not demonstrate incompetence. "[A]ny experienced trial lawyer knows ... that it is not always wise to make all possible objections." *Id.* at 792. Not objecting can be a strategic decision or inadvertence rather than incompetence. *Id.* at 793. That an attorney does not make a meritorious objection does not demonstrate incompetence unless the remaining record establishes that the attorney's overall performance fell short of established norms and that this incompetence probably affected the result. *Id.*

In this case, Elder singles out an isolated failure to object and argues that it constituted ineffective assistance of counsel. He makes no effort to show that his attorneys' overall performance fell short of established norms or that they demonstrated a consistent level of incompetence that probably affected the result. Hence, even if Elder was

---

1. Elder testified that he was not wearing a blue jacket when he was arrested. A police photograph taken at the time he was booked shows that he was wearing a blue jacket. Elder suggested that Thompson might have given the jacket to the police to give to him after his arrest.

correct in his assertion that the state's closing argument was objectionable, he would not be entitled to relief because we find no indication of overall incompetence.

The judgments of the trial court and motion court are affirmed.

All concur.