STATE of Missouri, Respondent,

v.

Leon TAYLOR, Appellant.

No. SC 81748.

Supreme Court of Missouri,
En Banc.

April 4, 2000.

As Modified on Denial of Rehearing
May 9, 2000.

Melinda K. Pendergraph, Asst. Public Defender, Columbia, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Krista D. Boston, Asst. Atty. Gen., Jefferson City, for Respondent.

MICHAEL A. WOLFF, Judge.

Leon Taylor was convicted in his first trial of first degree murder, first degree robbery, first degree assault, and three counts of armed criminal action. After the jury deadlocked, the trial judge sentenced Taylor to death on the murder conviction. This Court affirmed the convictions but granted a new penalty phase trial on the murder conviction. *State v. Taylor*, 944 S.W.2d 925 (Mo. banc 1997). In the second penalty phase trial, the jury recommended, and the court imposed, the death penalty for the first-degree murder conviction. We have jurisdiction. Mo. Const. art. V, sec. 3.

Taylor's main contentions on appeal are that he was discriminated against on the basis of his race in two respects:

(1) That the prosecutor's peremptory strikes, which resulted in an all white jury, violated *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986);

and

(2) That the Jackson County prosecutor's office discriminates against African–American defendants, and specifically Taylor, in the process that it uses to decide when to seek the death penalty.

Both of Taylor's major contentions are based on statistical disparities. In racial discrimination cases, it has been commonplace for courts to observe that "statistics tell much, and courts listen."[1] However, statistical analysis is only the beginning, not the end of the inquiry. The ultimate issue is whether racial discrimination has occurred, and racial discrimination is an intentional act. Courts consider statistical evidence of racial disparities and in some cases shift the burden of producing evidence or explanation to the state, as in *Batson.*

In this case, the trial judge gave careful consideration to Taylor's allegations and made appropriate findings based upon the evidence in accordance with the totality of circumstances. Although racial disparities exist, as Taylor points out, the burden of persuasion as to intentional racial discrimination remains with Taylor. The trial court found after careful review of the circumstances that Taylor failed to meet this burden. For reasons that follow, we affirm the trial court's judgment.

## I. Facts[2]

On April 14, 1994, Taylor, his half-brother, Willie Owens, and his half-sister, Tina Owens, were driving in Tina's car, discussing various robbery possibilities. Taylor suggested a gas station in Independence where only one person would be working. The trio went to the station and purchased some gasoline. Taylor asked whether they were going to rob it. Tina Owens said "no" because a little girl was inside. Sarah Yates, an eight-year-old, was keeping company with Robert Newton, her stepfather and the gas station manager.

The three left the station, only to return a few moments later after the oil light came on. Willie Owens went into the station and asked for some oil. Taylor next entered the store and stated they needed a different weight of oil. Taylor then drew a pistol and stated that he would shoot Newton unless he gave them money. Newton complied, handing Owens approximately $400 in a bank moneybag. Owens took the money and returned to the car.

Taylor directed Newton and the child to the station's back room. Taylor shot Newton once in the head, killing him. Taylor then pointed the gun at the child. Taylor pulled the trigger, but the gun jammed and did not discharge. Frustrated, Taylor locked the child in the back room and returned to the car. Taylor told Willie and Tina Owens that he had shot the man and that he had to go back inside to get the little girl. However, because the Owens couple wanted to leave, they then drove away.

## II. Did the Prosecutor's Explanations for Striking Venirepersons Violate *Batson?*

Taylor claims the trial court erred in overruling his motion based on *Batson* to the prosecutor's peremptory strikes of six African–American venirepersons. He contends that the trial court judge did not look at the "totality of the circumstances" in denying his *Batson* challenges as required in *Batson* and our cases. We disagree.

After Taylor's case was remanded to the trial court for a new trial as to the penalty, the new jury was all white.[3] The trial

---

1. This quote appears to have originated in the 1962 decision of the United States Court of Appeals for the 5th Circuit in *State of Alabama v. United States,* 304 F.2d 583 (5th Cir.1962).

2. Summarized from Taylor's original appeal, *State v. Taylor,* 944 S.W.2d 925 (Mo. banc 1997).

3. In Taylor's first trial, four African–Americans served on the jury. The jury deliberated

court conducted the jury selection in three phases.[4] In the first phase approximately 145 venirepersons were summoned for jury service in the Jackson County courthouse. Each venireperson filled out a questionnaire, which was drafted by the trial court with suggestions from counsel. The second phase included two panels, one in the morning and one in the afternoon, consisting of examination by counsel. The examination covered topics that were either not the subject of the questionnaire or had nothing to do with the issues of publicity or death qualification. The trial court ruled on strikes for cause in this second phase. In the third phase of jury selection, members of the venire were questioned individually, out of the presence of all other members, regarding their views touching upon the death penalty, whether they had read or heard anything about the case, and other related sensitive issues. In this third phase, both the trial court judge and counsel questioned the venirepersons. The trial court judge allowed each side eleven peremptory strikes, including two peremptory strikes for alternate venirepersons. *See* sections 494.480 and 494.485.[5]

To establish a claim under *Batson,* the defendant must object to the prosecutor's use of peremptory challenges as violating *Batson* and identify the cognizable racial group to which the stricken veniremember belongs. *State v. Parker,* 836 S.W.2d 930, 939 (Mo. banc), *cert. denied,* 506 U.S. 1014, 113 S.Ct. 636, 121 L.Ed.2d 566 (1992). The state then must provide race-neutral explanations for the peremptory challenges. *Id.* This step of the process does not demand an explanation that is persuasive. *Purkett v. Elem,* 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995). If the prosecutor articulates a reason, the defendant must prove that the state's proffered reason was merely pretextual and that the strike was in fact racially motivated. *Id.* An appellate court will not overturn such a finding unless clearly erroneous. *Parker,* 836 S.W.2d at 939, n. 7, citing *Hernandez v. New York,* 500 U.S. 352, 368–69, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991); *State v. Griffin,* 756 S.W.2d 475, 482 (Mo. banc 1988); and *State v. Antwine,* 743 S.W.2d 51, 66 (Mo. banc 1987), *cert. denied,* 486 U.S. 1017, 108 S.Ct. 1755, 100 L.Ed.2d 217 (1988).

Taylor objected that striking all six African–American venirepersons violated his and the prospective jurors' rights to due process and equal protection under the United States Constitution and the Missouri Constitution. The record reflects that the trial court judge allowed both sides to make a detailed *Batson* record. The trial court judge found that the prosecutor gave clear and reasonably specific explanations of his legitimate reasons for exercising the peremptory challenges for all of the stricken venirepersons.[6] As to the six African–American prospective jurors that were struck, the prosecutor gave the following explanations:

> **Venireperson O.S.:** "It goes back to several. One is hardship for money .... He's wanted off because of his commitments as a coach. Also, his answer during the individual questioning was the 'place myself in his shoes.' We took that to mean he identified with him on this."

over a two-day period and could not agree on punishment.

4. All three phases were held on different days within a few weeks of each other.

5. All statutory references are to RSMo 1994, unless otherwise indicated.

6. The trial judge did not accept all of the prosecutor's explanations. For instance, the court did not find that working for Ad Hoc, an organization that supports law enforcement and victim groups, as a race-neutral reason. Further, the court did not find knowing two criminal defense attorneys was a race-neutral reason. *See* Footnote 8. However, the prosecutor was able to articulate other race-neutral reasons for striking the venireperson.

**Venireperson E.K.:** "During the death penalty qualification, your initial question is what are the views on the death penalty. She, without hesitation, said, 'Personally, I'm opposed to the death penalty.' Also, it's a belief she has held for some time."

**Venireperson T.J.:** "[T.J.] marked F [7] on the questionnaire which flagged her for the prosecution. She stated that she could not impose the death penalty. She works for Ad Hoc . . . . She has two brothers who were convicted themselves of robbery in the first degree. She was questioned herself about a murder that her nephew was involved in. She is a friend of Doc Holliday."

**Venireperson B.B.:** "[B.B.], during individual voir dire, stated that, 'My first choice is life without parole. Very very extreme to give the death penalty.' On her questionnaire . . . she has seen the results of someone being abused. From all the discovery I've got, the Defendant's mitigation is abuse as a child."

**Alternate Venirepersons L.W. and C.S.:** "We struck the two who marked lowest down towards leaning towards life without parole. Venireperson 64 also knows Charles Brown.[8] Charles Brown tried the Calvert Antwine case back when I was a public defender and the effect of that case. Mr. Hunt's notes show that she was very hesitant and that she stated, paraphrasing, she would lean towards life without parole."

**7.** The jury questionnaire included questions about the venirepersons' views on the death penalty. The answer marked F stated: "Although I'm philosophically, morally, or religiously against the death penalty, I do believe I can follow the law that requires me to fully consider the death penalty as one of the two possible options that I may vote for in this case."

**8.** Charles Brown and Doc Holliday are attorneys involved in criminal defense prosecution. Mr. Brown was involved in a highly publicized criminal trial in Kansas City. Mr. Holliday is also an attorney active in Freedom, Inc., an African–American political organiza-

**Venireperson L.W.:** "[Venireperson L.W.] marked F on her questionnaire. Also, her answers, religiously she said she would be very hesitant [to impose the death penalty]."

■ The trial court judge is obligated to apply a three-pronged analysis in assessing the explanations provided by the prosecutor. *State v. Antwine,* 743 S.W.2d 51, 64–65 (Mo. banc 1987). Trial judges must evaluate the susceptibility of the particular case to racial discrimination, the prosecutor's demeanor and, finally, the judge must evaluate the explanation itself. *Id.* at 65. Crucial to the analysis is whether similarly situated white venirepersons escaped the state's challenge. *Id.* See also *State v. Weaver,* 912 S.W.2d at 509. Here, after the prosecutor gave these race-neutral reasons, the trial judge made a preliminary ruling regarding *Batson* challenges and gave defense counsel time to examine the questionnaires and determine if the record needed to be supplemented as to the *Batson* challenges.[9] When a prosecutor articulates a race-neutral reason for a strike, the burden shifts to the defendant to show that the state's explanation was merely pretextual and that the strike was racially motivated. *State v. Elder,* 901 S.W.2d 87, 90 (Mo.App.1995). Taylor did not assert that there were white venirepersons on the panel who were similarly situated to O.S. and L.W. Defendant failed to establish that the State's justification for striking these venirepersons was mere

tion. Both are African–American. The court found that knowing Mr. Holliday was not a race-neutral reason. The prosecutor presented to the court that Mr. Holliday had been prosecuted by the Jackson County prosecutor's office, which was a race-neutral reason.

**9.** Defense counsel did not object to this procedure of supplementing the record regarding *Batson* challenges after the prosecutor was able to state its reasons after each venireperson. At this time, the judge asked the defense counsel how much time would be needed, and he responded that two hours would suffice.

pretext. *See also State v. White,* 941 S.W.2d 575, 582 (Mo.App.1997).

■ As to the other four prospective jurors, Taylor asserted similarly situated white venirepersons on the panel who were not struck. As to Venireperson E.K., defense counsel asserted that Venireperson D.R., a white male, also marked E[10] on his questionnaire. However, the prosecutor noted that the two were different in that Venireperson D.R. hesitated in his answer about the death penalty and gave pros and cons regarding when it was appropriate, whereas, Venireperson E.K. did not have any hesitation in answering questions regarding her view on the death penalty.

■ Defense counsel asserted that Venireperson T.J. marked F on her questionnaire and referred to a multiple homicide case, had two brothers who were convicted, and had a cousin on trial. A similarly situated white male, Venireperson C.K., was not struck even though he made reference to famous murderers Ted Bundy and John Gacy and had a brother in prison. Venireperson C.K. marked D[11] on the questionnaire.

Counsel next asserted that Venireperson C.S., who marked a D and an E on the questionnaire and knew two attorneys, was similarly situated to Venireperson J.T., a white female, who marked E on the questionnaire and whose husband was a friend of an attorney.

The next prospective *juror that defense* counsel compared was B.B., who said she had seen the results of someone being abused and the case would have to be extreme for the death penalty to be imposed. B.B. was compared to Venireperson C.K., *supra,* who stated that he had witnessed fights between his parents.

Up to this point it is clear that the prosecutor gave race-neutral reasons with distinctions regarding the white venireper-

sons and the black venirepersons struck. *See State v. Weaver,* 912 S.W.2d 499 (Mo. banc 1995) (hesitancy in answering questions is a race-neutral reason); *State v. Brown,* 998 S.W.2d 531 (Mo. banc 1999)(striking venireperson convicted of a felony is race-neutral reason); *State v. Smulls,* 935 S.W.2d 9, 18 (employed by or related to attorneys survives a *Batson* challenge); *State v. Turner,* 921 S.W.2d 658 (Mo.App.1996) (venireperson struck because a family member was in prison is a race-neutral reason); *State v. Dunn,* 906 S.W.2d 388 (Mo.App.1995). However as to Venireperson B.B., there was extensive discussion by the trial court judge and the attorneys regarding whether witnessing abuse was race-neutral when there were several white venirepersons who had witnessed some form of abuse. Ultimately, after looking at all the factors the trial court judge denied the challenge.

Counsel compared Venireperson B.B. to Venireperson P.A., who stated she knew many women who had been sexually assaulted, to Venireperson J.D., who stated that one time she saw her brother-in-law grab her sister, and to Venireperson R.H., who stated she had an abusive husband and she had sought an order of protection. The trial court judge recognized that the white venirepersons all witnessed abuse and were not struck by the state. The trial court judge reviewed Venireperson B.B.'s transcript and noted "she definitely made some pretty pointed statements that show hesitation...." Defense counsel agreed with the trial court judge's assertion that hesitancy towards the death penalty is on its face a race-neutral reason. This Court has held that a venireperson's hesitation in answering questions regarding the death penalty will survive a *Batson* challenge. *See State v. Weaver,* 912 S.W.2d, 499 (Mo. banc 1995), and *State v. Morrow,* 968 S.W.2d 100 (Mo. banc 1998).

---

**10.** The answer marked E stated, "I am generally against the death penalty, but I believe I can put aside my feelings ..."

**11.** The answer marked D stated, "I can vote for the death penalty if it is appropriately based on the facts and the law ..."

The trial court judge further stated, "I find it personally troublesome, the prospect of having in a death penalty case with a black defendant having an all white jury ... I think that a race-neutral reason has been established."

■ *Batson* requires evaluating each stricken African–American venireperson on an *individual* basis as to whether the stated reason was race-neutral and not a pretext for discrimination. Taylor argues this process prohibited the judge from looking at the totality of the circumstances as this Court has prescribed in *Antwine*, 743 S.W.2d 51, and *State v. Parker*, 836 S.W.2d at 939. We disagree.

■ At the outset, it is important to note, the trial court judge continually asked the attorneys how each side wanted to proceed in regard to *Batson*. Defense counsel made no objection to the proceedings as long as he could "supplement the record," as he was allowed to do. Taylor is correct that trial court judges should take into account a variety of factors. As we stated in *Parker* and *Antwine*, "the chief consideration should be the plausibility of the prosecutor's explanations in light of the totality of the facts and circumstances surrounding the case." *Parker*, 836 S.W.2d at 939; *Antwine*, 743 S.W.2d at 65.

Taylor directs this Court to a federal court of appeals case where the trial court judge, according to Taylor, used a similar procedure during voir dire. There the appeals court found a *prima facie* case of discrimination. *Coulter v. Gilmore*, 155 F.3d 912(7th Cir.1998) In *Coulter* the trial judge looked "only in an isolated way at individual venirepersons and individual reasons." Although not controlling or binding on this Court, *Coulter* is distinguishable based upon the procedure used by the trial court.

A comparison of *Coulter* to the present case is helpful in demonstrating how the trial judge here did follow the law in *Batson* and our cases, *Parker* and *Antwine*.

In *Coulter*, the government used nine peremptory challenges to strike African–Americans from the jury venire; it also struck one non-African-American venireperson and left its four remaining challenges unexercised. For each peremptory challenge, and before a *Batson* challenge was raised by defense counsel, the state court instructed the government to state its reasons for the strike. These strikes prompted Coulter's attorney to move three times for a mistrial on the ground that *Batson* had been violated. These were denied.

The Illinois state appellate court initially remanded the case "for clarification of the record concerning the jury selection procedure ..." because the record was unclear regarding the judge's rulings, other comments or considerations, and his role during voir dire.

On remand, the trial judge conceded that there was nothing in the previous record that explained what the judge himself was doing at the time. The judge not only refused to allow Coulter's lawyer to conduct further discovery or *otherwise supplement the record*, but he also denied an express request from the lawyer to make an offer of proof. The Illinois appellate court criticized the trial court's decision to require the state to give its reasons for challenging each venireperson before the defendant raised a *Batson* issue, recognizing that this procedure impeded clear analysis of the issues.

The seventh circuit court of appeals in *Coulter* stated, "The state judge made those findings without ever taking into account the totality of the circumstances on the record; instead, he looked only in an isolated way at individual venirepersons and individual reasons, and even in that setting he overlooked remarkable similarities between the excluded African–Americans and the non-excludable Caucasians." Additionally, the seventh circuit criticized the "juror-by-juror" inquiry that the trial judge conducted, *unsupplemented by any final look at the record as a whole,* despite

counsel's efforts to present this evidence. The court noted this procedure "practically guaranteed the conclusion that the prosecution was acting race neutrally."

The procedure used by the trial court judge in this case is clearly distinguishable from the procedure in *Coulter*. The trial court judge here did a commendable job in making the record clear and understandable. Both parties agreed to the procedure. Further, the trial court judge did not allow the state to give its reasons for striking a prospective juror before a challenge was made. After the state gave its peremptory strikes, the trial court judge allowed defense counsel "as much time as needed" to look through the questionnaires in order to supplement the record regarding similarly situated white venirepersons. Defense counsel was then able to make a complete record of prospective jurors who were similarly situated before the trial judge gave a final ruling on the *Batson* issue.

The trial judge here also took a very active role. He took several notes for each venireperson and reread transcript answers to supplement his notes. His comments throughout the jury selection demonstrate that he was looking at relevant factors, the evidence, and the totality of the circumstances:

> **Court:** "I'd like to do [the challenges] one at a time. I wanted to see the whole picture, but I think we ought to take them up one at a time, unless you have an objection otherwise." [12]

> **Court:** "The Defendant cannot really fully consider the information in response to Batson records because they didn't know who the strikes were until the state announces their strikes ... you'll know what their reasons are and then you can make a rebuttal in one shot with the ability to carefully review those documents."

**12.** This was in response to the trial court's having heard that six of the African-Ameri-

> **Court:** "Don't you think ... when you're making strikes for the state and someone shows a pronounced hesitation regarding the death penalty ... and I think Ms. B.B. fits this category—I even reviewed her transcript, she made pointed statements that show hesitation. Isn't that in and of itself a race-neutral reason? I feel for your situation ... we have expanded voir dire and it creates a lot of information ... probably makes it easier for the state to find a race-neutral reason."

> **Court:** "I find it personally troublesome, the prospect of having in a death penalty case with a black defendant having an all white jury ... I'm not sure intellectually I'm comfortable with the situation, but I think it's pretty clear it's [race neutral reason] met."

Additionally, in the court's order denying defendant's motion for acquittal or new trial, the trial court stated:

> "In complete candor, this Court finds it ... morally and intellectually troublesome the concept that a black defendant in Jackson County, Missouri, could be sentenced to death based upon the recommendation of an all white jury."

These statements demonstrate the trial judge was sensitive to the *Batson* issues and was aware of the surrounding circumstances. The trial court judge does not ultimately have to use the words "totality of the circumstances" to comply with *Batson*. If the record is clear that the trial judge looked at the totality of the circumstances, then this Court will not disturb the trial court's decision. Here the trial judge looked at the "whole picture," was aware that defendant was black and the jury members were white, and gave defense counsel ample time and discretion to supplement the record.

Finally, the trial judge was presented with evidence of similarly situated white venirepersons. The crucial and determi-

cans were struck by the state.

native inquiry in a *Batson* claim is whether the state has treated similarly situated venirepersons differently based on race. *See State v. Roberts,* 948 S.W.2d 577, 602 (Mo. banc 1997).

### a. Pattern of Strikes As Indicative of Pretext.

Taylor suggests that the trial court judge in failing to look at the totality of circumstances did not consider the pattern of strikes in determining whether there was a discriminatory motive. The record does not support Taylor's contention.

■■■■ While evidence of a pattern of strikes against African–Americans can be indicative of racially motivated peremptory challenges, that is not the case here. *See Batson,* 476 U.S. at 97, 106 S.Ct. 1712. The prosecutor in this case used six of eleven peremptory challenges to strike all of the African–Americans sitting on the panel. As this Court stated in *State v. Griffin,* the state is not required to adhere to a specific mathematical formula in the exercise of its peremptory challenges. 756 S.W.2d 475, 482 (Mo. banc 1988).[13] In *Griffin,* the defendant pointed to no particular conduct on the part of the prosecutor that indicated racial motivation for his peremptory challenges except that the prosecutor used half of his strikes against African–Americans. Taylor fails to demonstrate a pretextual motive for the peremptory strikes by the prosecutor. Even if the reasons given by the prosecutor result in the use of strikes against African–Americans more often than against white venirepersons, the strikes will not violate *Batson* without some showing that the prosecutor removed the potential venireperson "because of" their race. *Devoil–El v. Groose,* 160 F.3d 1184 (8th Cir.1998) (In *Devoil–El,* the defendant argued that the trial judge did not look at the totality of the circumstances and, thus, erred be-

cause he evaluated each strike individually instead of looking at the pattern of strikes.)

In the present case we recognize the superior vantage point occupied by the trial judge. He was able to view the panel members; listen to their responses; analyze and supervise the statements and questions made by the prosecutor during voir dire; and evaluate the reasons the prosecutor offered for exercising his peremptory challenges as he did. The trial judge found no discriminatory exclusion. Upon review of the record, we find no statements or questions by the prosecutor or any other relevant circumstances to support an inference of discrimination. The defendant has failed to show purposeful discrimination.

### b. McCleskey v. Kemp Does Not Apply to Batson Challenges.

Taylor asserts that the trial judge erred in applying *McCleskey v. Kemp,* 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987), to his *Batson* challenges. *McCleskey* is significant in regard to Taylor's second issue discussed *infra,* regarding the prosecutor's discretion in choosing to pursue the death penalty for this crime committed by Taylor.

Taylor argues that because the trial court judge's order "Denying Defendant's Motion for Acquittal and New Trial" discusses *McCleskey* under the heading "Batson Issues," the correct *Batson* standard was not applied. The record in both the trial transcript and the order refutes this assertion. After the defendant made his objections under *Batson,* the trial judge stated:

> "[it] has been called to my attention, number 1, I definitely need the race-neutral reasons. I believe I think the case should stand for the proposition that I should make findings and, further,

**13.** The Court does not mean to discredit statistical studies, and in some cases statistical support will be persuasive and useful, especially where the prosecutor has articulated

very weak race-neutral reasons or from other surrounding circumstances, such as the prosecutor's prior conduct at death penalty trials.

stand for the proposition that the defendant should have a right to make a rebuttal argument before the ruling is made permanent ... I'm in compliance with that case [Batson]."

The court's order does address *McCleskey,* but *only after* the court completed its discussion on its reasons for denying the *Batson* challenges.

The judge discussed *McCleskey* in the context of the jury selection procedure as a whole, the death qualifying process, and his moral beliefs as to disparate treatment of black defendants. His discussion did not misdirect his decisions on *Batson* challenges. The judge cited *McCleskey* for its statistical studies and other data suggesting the death penalty creates a disparate impact on people of color, especially in circumstances where there is a black defendant and a white victim. *See McCleskey* at 285–292, 107 S.Ct. 1756. In *McCleskey,* the Supreme Court stated the statistics were not clear and sufficient proof for an equal protection violation. But this, again, demonstrates the judge was aware of surrounding circumstances and sensitive to defendant's claims. The judge in this case did not use the wrong standard in denying the *Batson* challenges.

### III. Prosecutorial Discretion in Seeking the Death Penalty

■ Taylor's next point raises two issues. First, he alleges an equal protection violation and an eighth amendment violation [14] by asserting that the decision to seek the death penalty was the product of racial discrimination by the prosecutor's office in that black defendants charged with murder are more likely than white defendants to face the possibility of the death penalty. Second, he challenges the prosecutor's broad discretion and claims the prosecutor discriminated against him

specifically when seeking the death penalty.

To establish an equal protection violation, Taylor directs this Court to statistics demonstrating a disparity between black and white defendants and other defendants with similar crimes who were offered life without parole.

These assertions have been rejected by this Court in *State v. Mallett* 732 S.W.2d 527 (Mo. banc 1987), and *State v. Taylor,* 929 S.W.2d 209 (Mo. banc 1996). *Mallett* specifically relied on *McCleskey v. Kemp* to determine that statistics alone would not be enough to prove an equal protection violation. In *McCleskey,* the United States Supreme Court held that "statistics indicating a disparate impact seldom suffice to establish an equal protection claim." *State v. Mallett,* 732 S.W.2d 527, citing *McCleskey v. Kemp,* 481 U.S. 279, 290, 107 S.Ct. 1756, 95 L.Ed.2d 262.

■ To establish an equal protection violation, a defendant must show an intent to discriminate. *Mallett,* 732 S.W.2d at 538. Here, in addition to statistics, Taylor presents evidence that in other murder cases the prosecutor did not seek the death penalty but either allowed the defendant to plead guilty and receive life in prison or that life imprisonment was the punishment that the prosecutor sought at trial. This is insufficient evidence for an equal protection violation.

■ Prosecutors are given broad discretion in seeking the death penalty. *See section* 535.030. A prosecutor's broad discretion does not extend to decisions deliberately based on unjustifiable standards such as race or some other entirely arbitrary factor. *Wayte v. United States,* 470 U.S. 598, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985). Taylor must prove both the prose-

---

14. Taylor's brief addressed an eighth amendment violation in passing, noting that in *Furman v. Georgia,* the Supreme Court held that it was cruel and unusual punishment to sentence someone to death if the punishment is meted out arbitrarily and capriciously. 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). Under section 565.035.3, this Court reviews each death penalty case to ensure that the sentence was not given arbitrarily. *See* section VII., *infra.*

cutor's decision had a discriminatory effect on him and it was motivated by a discriminatory purpose. As the Supreme Court stated in *McCleskey*, "because discretion is essential to the criminal justice process," the Court demands "exceptionally clear proof" before it will infer that the discretion has been abused. 481 U.S. at 297, 107 S.Ct. 1756 and *Mallett*, 732 S.W.2d at 539. Prosecutors must look at a variety of factors including statutory aggravating circumstances, the type of crime, the strength of the evidence and the defendant's involvement in the crime in deciding whether to seek the death penalty. Taylor does not present "exceptionally clear proof" the prosecutor's office arbitrarily seeks the death penalty for black defendants or for him in particular.[15]

## IV. Victim Impact Evidence is Admissible

■ Taylor alleges that the trial court erred in overruling his objections to the testimony of Sarah Yates as improper victim impact evidence. This Court has consistently held that victim impact evidence is proper and admissible as long as it is not "so unduly prejudicial that it renders the trial fundamentally unfair." *Payne v. Tennessee*, 501 U.S. 808, 825, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991); *State v.*

*Roberts*, 948 S.W.2d 577 (Mo. banc 1997); *State v. Gray*, 887 S.W.2d 369 (Mo. banc 1994). Victim impact evidence is another form or method of informing the court about the specific harm caused by the crime in question. *State v. Worthington*, 8 S.W.3d 83 (Mo. banc 1999).

■ Here, the only victim impact evidence presented during the penalty phase came from Astrid Newton, the victim's wife, and Sarah Yates, the victim's step-daughter.[16] Ms. Yates testified that she considered Robert Newton her father and called him "daddy." She testified about her relationship with Robert Newton. Ms. Yates also described the attack against her father and her actions thereafter including saying a long prayer over his body. The victim impact evidence here was relevant and admissible to inform the court of the impact Mr. Newton's death had on his family. *See section* 565.030.4 and cases cited *supra.*

## V. Trial Judge can Find Prior Convictions to be "Serious" and "Assaultive."

■ Taylor objected to Instruction Number 6 because it listed Taylor's prior convictions and did not require the jury to find whether Taylor had one or more serious assaultive convictions.[17] The trial

---

15. Taylor also contends that in closing argument the prosecutor made comments directed at his right not to testify. Trial counsel is entitled to wide latitude in making a summation. *State v. Mahurin*, 799 S.W.2d 840 (Mo. banc 1990). This claim was not properly preserved and no plain error exists. The prosecutor's statements at best, raise a weak inference on Taylor's right to not testify.

16. Taylor had nine mitigation witnesses to testify to his background and childhood. There were more than 150 pages of transcript from these witnesses compared to thirteen pages from Ms. Yates.

17. Instruction No. 6 read, in pertinent part, as follows:

In determining the punishment to be assessed against the defendant for the murder of Robert Newton, you must first unanimously determine whether one or more of the

following statutory aggravating circumstances exists:
1. Whether the defendant was convicted of Murder in the Second Degree on July 31, 1979 . . . .
2. Whether the defendant was convicted of Attempted Robbery in the First Degree on June 1, 1982 . . . .
3. Whether the defendant was convicted of Robbery in the First Degree on July 30, 1985 . . . .
4. Whether the defendant murdered Robert Newton for the purpose of the defendant receiving money or any other thing of monetary value from Robert Newton or another.
5. Whether the murder of Robert Newton was committed for the purpose of avoiding a lawful arrest of defendant.

You are further instructed that the burden rests upon the State to prove at least one of the foregoing circumstances beyond a reasonable doubt . . . .

court overruled the objection, finding that the submission of individual convictions was consistent with MAI–Cr3d 313.40 and the Notes on Use.[18] MAI–CR3d 313.40 is the penalty phase instruction submitting statutory aggravating circumstances. The trial court found the convictions of second degree murder, attempted robbery in the first degree, and robbery in the first degree to be serious assaultive convictions. The procedure employed here, in conformance with the MAI and accompanying notes, detracts in no way from the function of the trier of fact. The court must determine as a matter of law whether the prior convictions are "serious assaultive criminal convictions," and then the jury is allowed to determine as a matter of fact whether defendant indeed had prior convictions of second degree murder, attempted robbery, and robbery. In *State v. Parkus*, 753 S.W.2d 881 (Mo. banc 1988), the trial judge did not make the findings *on the record* but there was other evidence presented regarding the conviction. In this case we do not reach the merits of whether other evidence of the convictions is required to comply with the statute because the jury found "at least one" other aggravating circumstance. *See State v. Ramsey*, 864 S.W.2d 320 (Mo.1993). The jury found as an aggravating circumstance, in addition to his prior convictions, that Taylor murdered Newton for the purpose of receiving money or any other thing of monetary value

from Robert Newton or another. The aggravating circumstances found by the jury were valid, however; even if the first three aggravating circumstances were invalid, the proceedings were not tainted so as to invalidate the other aggravating circumstance found and the death sentence imposed. *See State v. Sidebottom*, 781 S.W.2d 791, 799 (Mo. banc 1989). A death sentence will be affirmed if even one valid statutory aggravating circumstance is found. *State v. Sloan*, 756 S.W.2d 503, 509 (Mo. banc 1988). The trial court did not err.

## VI. No Double Jeopardy Violation for Submitting Aggravating Circumstance[19]

Taylor also objected to Instruction 6 because it submitted aggravating circumstances that the previous trier, Judge Mauer, had found not to exist.[20] He asserts that the state should have been collaterally estopped from submitting this aggravating circumstance since the first trier of fact did not find it. He also alleges that the submission constituted double jeopardy. In the first proceeding Judge Mauer did not recite that the aggravating circumstance "defendant murdered Newton for the purpose of receiving money or taking other thing of monetary value from Robert Newton or another" was not proven beyond a reasonable doubt as he did for the

---

Therefore if you do not unanimously find from the evidence beyond a reasonable doubt at least one of the foregoing statutory aggravating circumstances exist, you must return a verdict fixing the punishment of the defendant at imprisonment for life by the Department of Corrections without eligibility for probation or parole.

18. The structure of our death penalty statute implicitly requires each statutory aggravating circumstance be submitted separately because once a jury finds one aggravating circumstance, it may impose the death penalty. Separation of such prior convictions permits the jury to consider the death sentence if any one of several convictions is found to exist. *State v. Shaw*, 636 S.W.2d 667 (Mo. banc 1982). By separating the prior convictions, any po-

tential jury confusion is eliminated. *State v. Ramsey*, 864 S.W.2d 320 (Mo.1993).

19. Taylor asserted that the trial court erred in not submitting non-statutory mitigating factors. Taylor submitted a non-MAI instruction proposing to include non-statutory mitigating circumstances. The trial court rejected the proposed instruction for MAI-CR 3d 313.44A. This court has held that non-statutory mitigating circumstances do not have to be listed and are not required. *State v. Deck*, 994 S.W.2d 527, 539 (Mo. banc 1999) and *State v. Parker*, 886 S.W.2d 908, 928-929 (Mo. banc 1994).

20. During Taylor's first trial, the jury could not agree on punishment, thus Judge Mauer became the trier of fact.

fifth aggravating circumstance "avoiding a lawful arrest." Instead, Judge Mauer asserted that it was not applicable to the case because a different MAI paragraph should have been used. This same argument was rejected in *State v. Simmons*, 955 S.W.2d 752 (Mo. banc 1997). *See also Poland v. Arizona*, 476 U.S. 147, 106 S.Ct. 1749, 90 L.Ed.2d 123 (1986).

 Taylor asserts that the death penalty statute is unconstitutional. This argument has been rejected. Our death penalty statute is constitutional. *See State v. Worthington*, 8 S.W.3d 83 (Mo. banc 1999); *State v. Mercer*, 618 S.W.2d 1 (Mo. banc 1981); *State ex rel. Davis v. Shinn*, 874 S.W.2d 403 (Mo.App.1994).

### VII. Proportionality Review

Section 565.035.3 requires this Court to conduct an independent review of a defendant's death sentence. The Court must decide whether the death sentence is excessive and disproportionate to other similar cases, whether the evidence supports the jury's findings of an aggravating circumstance, and whether the sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor.

After careful review of the record and transcript, this Court finds that the sentence of death imposed on Mr. Taylor was not imposed under the influence of passion, prejudice or any other arbitrary factor. In this case, the jury found two aggravating circumstances, which consisted of murder for monetary gain and the offense was committed by a person who has one or more serious assaultive criminal convictions. *See* section 565.032.

 The evidence supports the findings. Considering the crime, the strength of the evidence, and the defendant, this Court finds the facts of this case are consistent with death sentences affirmed wherein victims were murdered in course of a robbery. *See e.g., State v. Jones*, 979 S.W.2d 171 (Mo. banc 1998); *State v. Bar-*

*nett*, 980 S.W.2d 297 (Mo. banc 1998); *State v. Simmons*, 955 S.W.2d 752 (Mo. banc 1997); *State v. Laws*, 661 S.W.2d 526 (Mo. banc 1983); *State v. Gilmore*, 697 S.W.2d 172 (Mo. banc 1985); *State v. Kreutzer*, 928 S.W.2d 854 (Mo. banc 1996); *State v. Tokar*, 918 S.W.2d 753 (Mo. banc 1996); *State v. Ramsey*, 864 S.W.2d 320 (Mo. banc 1993).

### VIII. Conclusion

For the foregoing reasons, the judgment is affirmed.

All concur.