# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 07-2882

———————

Leon Taylor,

            Appellant,

v.

Donald Roper,

            Appellee.

\*
\*
\*
\*   Appeal from the United States
\*   District Court for the
\*   Western District of Missouri.
\*
\*
\*

———————

Submitted: January 15, 2009
Filed: August 19, 2009

———————

Before BYE, COLLOTON, and GRUENDER, Circuit Judges.

———————

COLLOTON, Circuit Judge.

A jury convicted Leon Taylor of first-degree murder under Missouri law, and a different jury sentenced him to death. After the Supreme Court of Missouri affirmed his conviction and sentence and upheld the denial of his motions for state post-conviction relief, Taylor filed a petition for writ of habeas corpus under 28 U.S.C. § 2254. In his petition, Taylor, who is a black male, alleged that the prosecution exercised peremptory challenges based on race, in violation of the Equal Protection

Clause, during the selection of both the jury that convicted him and the jury that sentenced him. The district court[1] denied Taylor's petition, and we affirm.

I.

In 1994, Taylor was prosecuted for the robbery and murder of a gas station manager in Independence, Missouri. The Supreme Court of Missouri summarized the incident in its opinion affirming Taylor's convictions. On April 14, 1994, Taylor and two of his relatives, Willie and Tina Owens, pulled into a gas station in Independence. Willie entered the station, and Taylor soon followed. The manager of the station and his eight-year-old stepdaughter were inside. Taylor drew a gun and demanded money from the manager, threatening to shoot him if he did not comply. After the manager handed Willie $400, Taylor ordered the manager and the girl into a back room. There, Taylor shot and killed the manager. Taylor then pointed the gun at the girl and pulled the trigger, but the gun jammed and failed to discharge. Taylor left the girl locked in the back room, and drove away with his companions. *See State v. Taylor* (*Taylor I*), 944 S.W.2d 925, 930 (Mo. 1997).

Taylor was arrested and charged with first-degree murder, first-degree robbery, first-degree assault, and three counts of armed criminal activity. The Jackson County prosecutor's office gave notice of its intention to seek the death penalty, and the case proceeded to trial.

During jury selection, the prosecution exercised peremptory strikes against three black members of the venire: Antoinette Gordon, Jason Johnson, and Ray Lovelace. Citing *Batson v. Kentucky*, 476 U.S. 79 (1986), defense counsel objected to the strikes, alleging that they were motivated by the race of the prospective jurors

---

[1]The Honorable Fernando J. Gaitan, Jr., United States District Judge for the Western District of Missouri.

and thus prohibited by the Equal Protection Clause of the Fourteenth Amendment. After the prosecution proffered race-neutral reasons for the strikes, the trial court asked if there was "[a]nything further." Defense counsel said no, and the trial court overruled Taylor's objections.

Several days later, after the jury had been chosen and the venire discharged, defense counsel renewed Taylor's objection to the prosecution's strike of Lovelace. Based on a further review of the record, counsel argued that the prosecution's race-neutral reasons for removing Lovelace were pretextual. The prosecution stood by its reasons for the strike, and the trial court again overruled Taylor's objection.

After a trial, the twelve-member jury, which included four black jurors, found Taylor guilty of all charges. The jury, however, could not agree on whether Taylor should be sentenced to death for first-degree murder, and under Missouri law at the time, the decision fell to the trial judge. *See* Mo. Rev. Stat. § 565.030.4, *invalidated in part by State v. Whitfield*, 107 S.W.3d 253 (Mo. 2003). After conducting an additional hearing, the trial court determined that the death penalty was appropriate based on the aggravating circumstance that Taylor had three prior "serious assaultive criminal convictions." *Id.* § 565.032.2(1). The trial court sentenced Taylor to death on the murder charge, and life plus 315 years' imprisonment on the remaining charges. Taylor appealed to the Supreme Court of Missouri. While his direct appeal was pending, Taylor filed a motion for post-conviction relief under Missouri Supreme Court Rule 29.15, alleging, among other things, that his trial counsel was ineffective. The trial court denied the motion, and Taylor appealed that ruling to the Supreme Court of Missouri as well.

The state supreme court resolved both Taylor's direct appeal and his appeal from the denial of post-conviction relief in a single decision. The court held that Taylor "abandoned" his *Batson* objections to the peremptory strikes of Gordon and Johnson by challenging the prosecution's race-neutral reasons for the first time on

appeal. *Taylor I*, 944 S.W.2d at 934. The court suggested that Taylor also waived his objection to the strike of Lovelace by challenging the prosecution's explanation too late, after the venire had been discharged. *Id.* The supreme court "[n]evertheless" examined the prosecution's reasons for striking Lovelace, and concluded that "the trial court decision was not clearly erroneous." *Id.* Rejecting Taylor's *Batson* claims, the supreme court affirmed his convictions, affirmed in part and dismissed as moot in part the denial of his Rule 29.15 motion, and affirmed his sentences for the noncapital offenses. *Id.* at 940. The court, however, reversed the sentence of death on the ground that the prosecution improperly urged jurors to rely on their emotions to decide whether the death penalty was appropriate. *Id.* at 937-38. The case was remanded for a second penalty phase. *Id.* at 940.

On remand, a new jury was selected to consider Taylor's punishment for first-degree murder. *Voir dire* proceeded in three phases. In the initial phase, the trial court asked prospective jurors to complete a questionnaire covering various topics, including their views on the death penalty. The court also identified prospective jurors who would suffer undue or extreme hardship from sitting on the jury, and excused those jurors from service. In the next phase, the court divided the remaining jurors into two panels. The prosecution and the defense questioned each panel separately, addressing the jurors as a group. Following this questioning, the court excused a number of jurors for cause.

In the final phase, the court called remaining jurors one at a time to answer further questions from the court and the parties. At the conclusion of each juror's questioning, the parties were given an opportunity to make a challenge for cause, and each juror who was not then excused by the court was deemed "qualified." The court continued to call individual jurors for questioning until there were thirty-eight qualified jurors. Of this number, thirty were placed on a panel of prospective principal jurors, and eight on a panel of prospective alternate jurors. The prosecution and the defense were each given nine peremptory strikes to remove prospective

-4-

principals and two peremptory strikes to remove prospective alternates, so that twelve principal jurors and four alternates ultimately would be selected.

The prosecution used its peremptory strikes to remove all six blacks on the final two panels: Ozie Stanley, Tracy Johnson, Edwina Kinsey, and Bonnye Brown from the panel of prospective principal jurors, and Latricia Wilson and Cecilia Smith from the panel of prospective alternates. Defense counsel objected to these strikes on the ground that they were unconstitutionally based on race. After the prosecution offered race-neutral reasons for each strike, defense counsel reasserted its *Batson* objections and compared some of the blacks who were struck to whites who were not. The court eventually overruled all six of Taylor's *Batson* objections.

The resulting jury recommended that Taylor receive the death penalty, and the trial court imposed a sentence of death. The Supreme Court of Missouri affirmed Taylor's sentence, concluding that his penalty-phase *Batson* claims lacked merit. *State v. Taylor* (*Taylor II*), 18 S.W.3d 366 (Mo. 2000). Taylor then filed a Rule 29.15 motion for post-conviction relief, alleging ineffective assistance of counsel during the second penalty phase. The trial court denied Taylor's motion, and the supreme court affirmed. *Taylor v. State* (*Taylor III*), 126 S.W.3d 755 (Mo. 2004).

In 2005, Taylor filed a petition for writ of habeas corpus under 28 U.S.C. § 2254 in federal district court. His petition sought review of various claims, including his allegation that the prosecution made peremptory strikes based on race during the selection of the guilt-phase and penalty-phase juries. The district court denied relief, and this court granted a certificate of appealability limited to *Batson* issues.

II.

"Although a prosecutor ordinarily is entitled to exercise permitted peremptory challenges for any reason at all, as long as that reason is related to his view concerning the outcome of the case to be tried," *Batson* established that "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race." 476 U.S. at 89 (internal quotation omitted). Although States may develop their own procedures for evaluating the constitutionality of a challenge, *Johnson v. California*, 545 U.S. 162, 168 (2005), *Batson* enumerated a three-step process to guide a trial court's review:

> First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race; second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question; and third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.

*Snyder v. Louisiana*, 128 S. Ct. 1203, 1207 (2008) (internal quotations and brackets omitted). Within this framework, the burden of persuasion to prove purposeful discrimination rests with the defendant, *Johnson*, 545 U.S. at 170-71, who may rely on "all of the circumstances that bear upon the issue of racial animosity" to meet it. *Snyder*, 128 S. Ct. at 1208; *see also Miller-El v. Dretke*, 545 U.S. 231, 240 (2005).

Whether a peremptory strike was motivated by race is ultimately a question of fact. *See Miller-El*, 545 U.S. at 240. Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), "a determination of a factual issue made by a State court shall be presumed to be correct" in a federal habeas proceeding. 28 U.S.C. § 2254(e)(1). Thus, a state court's determination regarding the prosecution's intent may be set aside only if Taylor rebuts "the presumption of correctness by clear and convincing evidence." *Id.*; *see Miller-El*, 545 U.S. at 240; *Smulls v. Roper*, 535 F.3d

853, 861-62, 864 (8th Cir. 2008) (en banc); *cf. Rice v. Collins*, 546 U.S. 333, 339 (2006).

Under AEDPA, moreover, a writ of habeas corpus may be granted only in limited circumstances. If Taylor's *Batson* claims were "adjudicated on the merits in State court proceedings," then he must show that the adjudication either "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2), or "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." *Id.* § 2254(d)(1).

## III.

We first consider Taylor's allegations that the prosecution exercised peremptory strikes based on race during the selection of the jury that convicted him of first-degree murder. Taylor objects to the guilt-phase strikes of three black prospective jurors: Antoinette Gordon, Jason Johnson, and Ray Lovelace.

## A.

The State contends that the merits of Taylor's objections to the strikes of Gordon and Johnson are not properly before us, because the Supreme Court of Missouri held that Taylor had "abandoned" those objections. *Taylor I*, 944 S.W.2d at 934. Relying on the flexibility courts have to develop rules to comply with *Batson*, Missouri courts have adopted "a unitary procedure for the vindication of *Batson* claims." *State v. Parker*, 836 S.W.2d 930, 940 (Mo. 1992). Under this procedure, the prosecution must come forward with race-neutral reasons once a timely *Batson* objection has been raised, regardless of whether the defendant has made a prima facie showing of purposeful discrimination. *Id.* at 939-40. If, however, the defendant fails

to challenge the prosecution's race-neutral explanation before the venire is discharged, then the objection is considered waived. *See, e.g.*, *id.* at 937; *State v. Antwine*, 743 S.W.2d 51, 64 (Mo. 1987); *State v. Kelly*, 851 S.W.2d 693, 697 (Mo. Ct. App. 1993); *State v. Jackson*, 809 S.W.2d 77, 91 (Mo. Ct. App. 1991). Applying this rule to Taylor, the Supreme Court of Missouri noted that he challenged the prosecution's reasons for striking Gordon and Johnson for the first time on appeal, and concluded that he had therefore waived his *Batson* objections. *Taylor I*, 944 S.W.2d at 934.

Given the supreme court's holding, the State argues that Taylor's constitutional claims regarding the two strikes are procedurally barred. The State contends that the "waiver" holding is an independent and adequate state ground that bars federal habeas relief, *see Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991), and notes that Taylor did not contest the adequacy of the state procedural bar in the district court. Alternatively, in the event that we reach the merits of the *Batson* claims, the State asserts that the trial court's rulings upholding the strikes should be treated as adjudications on the merits that are entitled to deference under 28 U.S.C. § 2254(d).

Taylor maintains that Missouri's rule requiring defendants to object after the prosecution gives its race-neutral reasons does not constitute a state ground adequate to preclude federal habeas review. *See Lee v. Kemna*, 534 U.S. 362, 366 (2002) (holding that Missouri Supreme Court Rules 24.09 and 24.10, as applied in Lee's case, were not adequate to bar federal habeas review). According to Taylor, a defendant should be able to preserve a *Batson* claim by objecting once, to the strike itself. Taylor contends that Missouri's requirement of an additional objection conflicts with federal law as articulated in *Batson*, which requires only that the trial court decide whether the strike was racially motivated once the prosecution offers its explanation. He thus argues that Missouri's requirement is inadequate as a procedural bar. He further argues that because the Supreme Court of Missouri did not address the merits of his *Batson* claims, we must conduct our review of the merits *de novo*, rather than under the deferential standard of § 2254(d).

We find it unnecessary to decide whether Missouri's rule is an independent ground adequate to bar review of Taylor's *Batson* claims, or whether Taylor should be permitted to challenge the adequacy of the procedural bar for the first time on appeal. Even assuming that Taylor is correct that Missouri's rule is inadequate to bar habeas review, and that § 2254(d) does not apply, his claims challenging the strikes of Gordon and Johnson fail. Whatever the force of the state supreme court's "waiver" holding, the state trial court found that the strikes were race-neutral and not the product of purposeful discrimination. That determination was not rejected by the state supreme court, and it is thus entitled to a presumption of correctness as the "determination of a factual issue made by a State court." 28 U.S.C. § 2254(e)(1). We conclude based on our examination of the record that Taylor has not rebutted the presumption by clear and convincing evidence, and that he is therefore not entitled to relief.[2]

We address first the strike of prospective juror Gordon. When the trial court asked for an explanation of the strike, the prosecution cited Gordon's views on the death penalty. The prosecutor explained: "[Gordon] was struck for the reasons during

---

[2]In evaluating the constitutionality of the peremptory strikes challenged in Taylor's petition, we take into account evidence presented by Taylor that does not relate specifically to the proceedings in this case. We do not, however, find the evidence strongly probative of discriminatory purpose by the prosecution in Taylor's case. Taylor presents statistical studies purporting to show racial discrimination in capital cases, but the focus of the studies is on racial disparities in the imposition of the death penalty generally, not in the exercise of peremptory challenges specifically. Taylor also presents the affidavit of a former Jackson County assistant prosecutor stating that during his tenure from 1982 to 1987, the office "routinely" struck blacks from juries and had "to develop specific alternative strategies when this was eventually challenged in court." But that account relates to a period that ended several years before Taylor's prosecution, and it is disputed by the deposition testimony of the prosecutor who was in charge of the office during that same time. He stated that an investigation conducted prior to *Batson*, which was decided in 1986, showed no pattern of racial discrimination in the office's exercise of peremptory strikes.

the individual voir dire that when asked if she could legally impose the death penalty, no I don't think I could, I can't say and then she said traditionally I have said no and she stated her reasons were partially religious." The trial court found that the reasons stated by the prosecutor were race-neutral, and overruled Taylor's objection. The court's ruling includes an implicit finding that the prosecutor's explanation was credible, and that the strike was not motivated by purposeful discrimination. *See Smulls*, 535 F.3d at 860, 863.

The trial court's finding is supported by the trial record, and Taylor has not mustered clear and convincing evidence to the contrary. The prosecutor accurately characterized the responses Gordon gave during jury selection. At the beginning of individual *voir dire*, the prosecution asked Gordon whether she could "legitimately consider imposing a sentence of death given the right situation." Gordon responded, "That's the hard question," and further answered, "For me, I would say no, I don't think I could." Asked if she did not feel "under any circumstances or situation after hearing the evidence" that she could "legitimately, actually do it, impose a sentence of death on the defendant," Gordon repeated, "That's a hard question for me." She then explained:

> [T]raditionally I'd say no and to be actually put in a situation, I couldn't say right at this moment to be honest with you, I couldn't say yes, I couldn't say no. I have traditionally said no. But after weighing the evidence and getting a thorough understanding, I can't tell you what I would say.

Gordon affirmed that her attitude toward the death penalty was "[p]artially a religious based" belief. The prosecutor's characterization of Gordon's responses was thus consistent with the record.

As the questioning continued, Gordon gave different answers to whether she would be able to consider the death penalty. When defense counsel asked if she was

"foreclosing the possibility that given the right case you could impose the death sentence," Gordon stated that she was not "totally ruling that out." She represented that she could "fairly consider" the death penalty and, in response to further questioning by the prosecution, maintained that "if the circumstances warrant [the death penalty] I could consider it." But even if Gordon seemed more open to considering the death penalty by the time the questioning ended, this evidence does not undermine the trial court's finding of a nondiscriminatory motive. Gordon's previous answers suggesting reluctance to impose a sentence of death furnished substantial grounds for the trial court to find that the prosecutor's race-neutral explanation was credible.

Taylor asserts that the prosecution's acceptance of two white prospective jurors, Patricia Rowland and Linda Stockdell, shows that its race-neutral reasons for striking Gordon were pretextual. Taylor claims that Rowland and Stockdell gave responses that were comparable to Gordon's, and that the only distinction between them was race. We disagree. Like Gordon, Rowland and Stockdell were asked by the prosecution whether they thought they could "legitimately" consider imposing the death penalty. But unlike Gordon, whose initial responses were equivocal at best, Rowland and Stockdell both answered in the affirmative: Rowland by stating, "Yes I do," and Stockdell by stating, "Yes, because I do believe in capital punishment."

Taylor maintains that replies by Rowland and Stockdell to other questions showed that their views on the death penalty were in fact similar to Gordon's. He relies on the fact that both Rowland and Stockdell said the possibility of the death penalty would cause them to hold the prosecution to a higher evidentiary standard than proof beyond a reasonable doubt. It was reasonable for the state courts, however, to conclude that Rowland and Stockdell did not express opposition to the death penalty, but rather simply misstated the requisite standard of proof before the matter was clarified. Both jurors eventually recognized that proof beyond a reasonable doubt was the correct standard. We do not find the comparisons with Rowland and

Stockdell to be persuasive evidence of a race-based strike, given the differences between their responses and Gordon's to whether they could consider the death penalty. The peremptory strike of Gordon does not justify a grant of Taylor's application for relief.

We next consider the strike of prospective juror Johnson. The prosecutor defended that strike by stating:

> [Johnson] first told us in individual voir dire he could not consider the death penalty. He then went on to say he did not believe in the death penalty. He went on to say that that [sic] shall not kill. He told us he had a moral conviction, he would never vote for death, he would always vote for life without parole and then you know, basically those are all of the reasons we struck him.

The trial court determined that these reasons were race-neutral, and overruled Taylor's objection, implicitly finding that the strike was not motivated by discriminatory intent. *See Smulls*, 535 F.3d at 860, 863.

Taylor has not demonstrated with clear and convincing evidence that the trial court's finding of no discriminatory motive was incorrect. The prosecutor's race-neutral reasons are supported by the record. Early in the questioning, the trial court asked Johnson if he could "seriously consider" both the death penalty and life imprisonment without parole. Johnson answered, "No." Asked which punishment he could not consider, Johnson said, "Death." He explained that he did not "believe in giving someone else the death penalty because that's like saying that that [sic] shall not kill" – a view he attributed to both "a moral conviction" and "religious beliefs." The prosecution asked if he was "basically" saying that he "could never consider voting to impose a sentence of death," to which Johnson replied, "Yes."

-12-

Taylor argues that the prosecutor misrepresented Johnson's beliefs by disregarding some of Johnson's other responses. Taylor notes, for example, that when defense counsel asked Johnson if he "could set aside your personal belief about the death penalty and follow the law as the Judge gives it to you," Johnson said, "Yes." And when the prosecution later asked if he would "be able to put aside what you believe in your heart and seriously consider voting to impose a sentence of death," Johnson also said, "Yes." As in Gordon's case, however, it was reasonable for the trial court to find that the prosecution struck Johnson based on his initial responses, which suggested considered opposition to the death penalty.

Taylor also argues that the prosecution's reasons for striking Johnson apply just as well to Rowland and Stockdell, the two white prospective jurors with whom Taylor compares Gordon. But whereas Stockdell said that she believed in capital punishment and Rowland said without any suggestion of personal opposition that she could consider the death penalty, Johnson stated that he did not believe in the death penalty based on his moral and religious convictions. Taylor has not shown by clear and convincing evidence that the state court was incorrect in finding that the prosecution's strike of Johnson was free from racial bias.

B.

The final guilt-phase *Batson* objection concerns the prosecution's strike of Lovelace. In the trial court, Taylor did not immediately challenge the prosecution's race-neutral explanation for this strike. He waited several days before objecting to the prosecution's reasons. Although the venire had been discharged by then, the trial court entertained Taylor's challenge. The court determined that the prosecution's reasons were race-neutral, and implicitly found that the strike was not motivated by purposeful discrimination when it overruled the challenge. *See Smulls*, 535 F.3d at 860, 863. On appeal, the Supreme Court of Missouri stated the following:

-13-

> Normally, a defendant must challenge a State's explanation prior to discharge of the venire so that the trial court can correct the alleged error without having to call a new venire and select a new jury. Nevertheless, an examination of the prosecutor's reasons for striking Loveland [sic] indicates that the trial court decision was not clearly erroneous.

*Taylor I*, 944 S.W.2d at 934 (citation omitted).

The State argues that we are precluded from considering the merits of Taylor's *Batson* claim challenging the prosecution's strike of Lovelace. It contends that the supreme court's rejection of Taylor's claim rested on an independent and adequate state ground – namely, Missouri's rule requiring defendants to challenge the prosecution's race-neutral reasons before the venire is discharged. We read the supreme court's decision differently. The opinion does not state "clearly and expressly" that it rests on a state procedural bar, *Harris v. Reed*, 489 U.S. 255, 263 (1989) (internal quotations omitted), but merely notes that a defendant must "[n]ormally" challenge the prosecution's reasons before the venire is discharged. The court then proceeded, "[n]evertheless," to address the merits of Taylor's *Batson* claim. We thus conclude that Taylor's claim is not procedurally barred.

The trial court found no discrimination in the prosecution's strike of Lovelace, and the Supreme Court of Missouri affirmed that finding. Unless Taylor rebuts by clear and convincing evidence the presumption that this finding was correct, 28 U.S.C. § 2254(e)(1), and shows that the finding was unreasonable, *id*. § 2254(d)(2), we may not grant him relief. *See Miller-El*, 545 U.S. at 240; *Smulls*, 535 F.3d at 861-62, 864.

The prosecutor offered the following race-neutral explanation for striking Lovelace:

> We struck Mr. Lovelace because of the reason we also struck a white juror, Mr. [Matthew] Berridge and also why we struck another juror, . . .

Rodney Johnson due to his education. He only has a 10th grade education. The further reason I struck him, . . . during general voir dire I didn't like his attitude. He was very inattentive, I saw him at one time I believe his eyes were closed. . . . He was constantly fidgeting, looking down, looking away.

Taylor argues that the prosecutor's comparison of Lovelace with Berridge is unsupported, because Berridge was neither white, as the prosecutor stated, nor uneducated, as the prosecutor implied. Rather, Taylor points out, Berridge was an American Indian who attended audio engineering school. These observations, however, do not undermine the trial court's finding of no discriminatory motive. Whether Berridge was American Indian, as opposed to white, is not significant; what matters is that he was not black. *See Miller-El*, 545 U.S. at 241 (explaining that a prosecutor's strike of a black juror should be compared with the prosecutor's treatment of "otherwise-similar *nonblack*" jurors) (emphasis added). That Berridge attended audio engineering school does not necessarily mean that he had more high-school education than Lovelace, who did not continue past the tenth grade. Taylor has not produced jury questionnaires or other evidence to refute the prosecutor's assertion about Berridge's lack of education.

Taylor also argues that the prosecution failed to strike two white prospective jurors, Harold Hageman and Lloyd Jones, whose educational levels were similar to Lovelace's. Hageman and Jones, however, each had one more year of high school than Lovelace. The prosecution also defended its decision to seat Hageman on the ground that he "was well into his 60's as far as age wise," suggesting that older jurors were more desirable to the prosecution. While the differences among these jurors are not great, peremptory challenges may turn on slight distinctions, so long as they are nondiscriminatory. The evidence cited by Taylor does not rebut the presumption of correctness accorded the trial court's decision to credit the education-related explanation. Whether or not we presume that the trial court also credited the prosecutor's concern about Lovelace's demeanor, *see Snyder*, 128 S. Ct. at 1209,

-15-

Taylor has not shown by clear and convincing evidence that the trial court's finding of no discriminatory motive was incorrect, or demonstrated that the finding was unreasonable.

## IV.

We next consider Taylor's claims that the prosecution exercised peremptory strikes based on race during the selection of the jury that sentenced him to death. In the final phase of *voir dire*, the prosecution used its peremptory strikes to remove all six remaining black prospective jurors. The impact of the strikes on the composition of the jury, however, is not dispositive. The important legal question is whether the prosecution acted with a discriminatory purpose in exercising any of the strikes.

## A.

When asked by the trial court to explain the peremptory strike of prospective principal juror Ozie Stanley, the prosecutor gave several reasons. The first set related to the effect that serving on the jury would have on Stanley's employment and income. During *voir dire*, Stanley had stated that he was getting called into work as a substitute teacher almost every day, and that he was the coach of a high school basketball team that had games scheduled for the same week as the trial. The prosecutor expressed concern about these commitments, noting that Stanley had "made it known there is a hardship for him." The prosecutor explained, "We're hitting him in the wallet," and "I just don't want a juror on there who is losing money because they're here."

The second set of reasons related to Stanley's views on the death penalty. The prosecutor drew attention to one of Stanley's answers on the questionnaire that prospective jurors completed in the first phase of *voir dire*. Question 46 asked jurors to circle the statement (or statements) that most accurately represented their beliefs

regarding the death penalty. Jurors were given the option of nine statements, labeled "a" through "i":

    a.      In a case in which the defendant is convicted and in which in [sic] the death penalty is requested, I will always vote for the death penalty.

    b.      I am strongly in favor of the death penalty, and would have a difficult time voting against it.

    c.      I am generally in favor of the death penalty, but I would base my decision to vote on it from the facts and the law in this case.

    d.      In a case in which the defendant is convicted and in which the death penalty is requested, I can vote for the death penalty if it is appropriately based on the facts and the law in the case.

    e.      I am generally against to [sic] the death penalty, but I believe I can put aside my feelings against the death penalty and vote for the death penalty if it is called for by the facts and the law in the case.

    f.      Although I am philosophically, morally, or religiously against to [sic] the death penalty, I do believe that I can follow the law that requires me to fully consider the death penalty as one of two possible options that I may vote for in this case.

    g.      I am strongly against to [sic] the death penalty, and I will have a difficult time voting for it.

    h.      I am personally, morally, or religiously against to [sic] the death penalty, and would never vote for it under any circumstances.

    i.      None of the above.

Stanley circled statements "d," "e," and "f." The prosecutor explained: "Every surviving venireperson who marked F, with the exception of number 7, Nancy Pfeifer,

has been struck peremptorily by the State. The reason we kept Ms. Pfeifer is her answers on individual [*voir dire*] did not indicate that of an F juror."

The prosecutor also referenced Stanley's answer to a question during individual *voir dire*. Stanley was asked about the statements he had circled on the questionnaire, and his answer was: "If I said death penalty, just automatically, am I doing the same thing? You know, if I vote to give someone a death penalty what shoes am I now wearing? You know, am I in the same boat?" This response, the prosecutor argued, provided additional justification for the strike. The prosecutor said, "We took that [response] to mean he identified with [Taylor] on this. . . . Am I now putting myself down as a killer for the after-life?"

After listening to the prosecutor's explanation, the trial court stated:

> I'm going to deny the challenge on Ozie Stanley. I believe there are a variety of race-neutral reasons that exist. This may apply to several of these jurors. But between the questionnaire and individual questioning, we do have a fairly good understanding as relates to many of these jurors relating to their attitude towards the death penalty.

The court then mentioned two cases: *Wainwright v. Witt*, 469 U.S. 412 (1985), which reaffirmed that a prospective juror may be excluded for cause if his opposition to the death penalty will "prevent or substantially impair the performance of his duties," *id.* at 424 (internal quotation omitted); and *Morgan v. Illinois*, 504 U.S. 719 (1992), which held that a prospective juror may be excluded for cause if he "will automatically vote *for* the death penalty in every case." *Id.* at 729 (emphasis added). The trial court explained that in ruling on challenges for cause earlier in *voir dire*, it had "attempted to cut a fairly broad swath between the *Witt* and *Morgan* excludables." But, the court stated, "if someone is clearly towards one end of the spectrum or the other, I think that in and of itself in most circumstances would certainly be a reason [for a peremptory strike], and I think [Stanley] would fit that category." The court

added, "I also think all of his employment type problems fit that category." After defense counsel reasserted Taylor's objection to the strike, the trial court made final its ruling.

The Supreme Court of Missouri affirmed. Recognizing "the superior vantage point occupied by the trial judge," who "was able to view the panel members; listen to their responses; analyze and supervise the statements and questions made by the prosecutor during voir dire; and evaluate the reasons the prosecutor offered for exercising his peremptory challenges as he did," *Taylor II*, 18 S.W.3d at 375, the court concluded that Taylor "failed to establish that the State's justification for striking [Stanley] was mere pretext." *Id.* at 371-72.

Taylor claims that the conclusion of the state courts is unsupportable for three reasons. First, he argues that the prosecutor was not genuinely concerned about Stanley's answer on the questionnaire, because the prosecution chose not to strike Nancy Pfeifer, a white juror who, like Stanley, marked "f" on question 46.[3] But as the prosecutor himself explained, Pfeifer's answers during individual *voir dire* showed that statement "f" did not fully reflect her views on the death penalty. Although Pfeifer stated that she "[p]ersonally . . . wish[ed] we didn't have to have [the death penalty]," she also stated, "it is a fact that we have to have it, and from my views and my Christian standpoint it is biblical. . . . [B]ecause of my Christian belief and the way it has been set up it has been ruled that if someone takes a life their life has to be taken, depending on the facts and what's been set forth." Far from being "religiously against" the death penalty, as her selection of "f" may have suggested in isolation,

---

[3]The State argues that Taylor waived this and other comparisons with nonblack prospective jurors by not raising the comparisons in the trial court. In *Taylor II*, however, the Supreme Court of Missouri did not hold that Taylor had procedurally defaulted reliance on these comparisons. We therefore consider them in light of the evidence before the state courts. *See Snyder*, 128 S. Ct. at 1211 n.2; *Miller-El*, 545 U.S. at 241 n.2.

-19-

Pfeifer thought the death penalty was religiously *required* in certain circumstances. Stanley, by contrast, expressed reservations about voting for the death penalty, questioning whether a juror's vote for the punishment would place him in "the same boat" as the murderer. Therefore, Pfeifer was not similarly situated to Stanley, and the prosecution's decision not to strike Pfeifer was not indicative of pretext.

Other evidence in the record supports the credibility of the prosecution's explanation that Stanley was struck because he circled "f." Of the eight statements listed on question 46, "f" was the least favorable to the death penalty marked by any of the thirty-eight prospective jurors on the final two panels. Six of the thirty-eight marked "f," and the prosecutor did not exaggerate when he said that every one, except Pfeifer, was peremptorily struck by the prosecution. The "f" jurors who were struck included two nonblack jurors, one of whom, like Stanley, marked not just "f," but "d" and "e" as well. That the prosecution exercised its strikes so consistently against "f" jurors undermines Taylor's argument that the prosecution's concern about Stanley's selection of "f" was pretextual.

Second, Taylor contends that the prosecutor misrepresented Stanley's response to a question during individual *voir dire*, and that this misrepresentation evinces discriminatory intent. According to Taylor, the prosecutor described Stanley as saying that he would consider Taylor's viewpoint before voting for the death penalty, when Stanley said no such thing. But while the prosecutor did describe Stanley as saying that he would place himself in Taylor's shoes, the best reading of the transcript is that the prosecutor meant only that Stanley, by asking whether a vote for the death penalty would put him in "the same boat" as the defendant, implied that he thought imposition of the death penalty was akin to murder. The prosecutor was concerned not that Stanley would consider the death penalty from Taylor's perspective, but rather that Stanley thought voting for the death penalty would be "putting [him]self down as a killer for the after-life." Taylor's claim that the prosecutor misrepresented Stanley's views has no merit.

-20-

Third, Taylor argues that the prosecutor's reasons relating to Stanley's work commitments were pretextual because numerous other prospective jurors sought to be excused because of work. Taylor, however, fails to identify any particular juror with commitments similar to Stanley's who was not ultimately excused.

Taylor has not presented clear and convincing evidence showing that the prosecution struck Stanley because of race. The prosecutor accurately characterized Stanley's answers on the questionnaire and during individual questioning, and persuasively explained why Pfeifer, a white juror proffered by Taylor as a comparator, was not peremptorily struck. The determination by the state courts that the prosecution's race-neutral reasons for striking Stanley were not pretextual was thus not contrary to clear and convincing evidence or unreasonable.

In addition to challenging the factual basis of the state courts' decision, Taylor argues that the decision involved an unreasonable application of clearly established federal law. He contends that the Supreme Court of Missouri unreasonably applied *Batson* by giving too much weight to whether similarly situated white prospective jurors were challenged by the prosecution. But while the supreme court did note before rejecting Taylor's claim that he "did not assert that there were white venirepersons on the panel who were similarly situated to [Stanley]," *Taylor II*, 18 S.W.3d at 371, there is no indication that it assigned more importance to the existence of such comparisons than *Batson* allows. Taylor has not shown that the supreme court unreasonably applied clearly established federal law.[4]

---

[4]Taylor similarly argues that the state supreme court unreasonably applied *Batson* by giving too much weight to comparisons in adjudicating the other penalty-phase strikes challenged in his petition. For the same reasons, we reject this argument in the case of the other jurors.

-21-

B.

Like Stanley, Tracy Johnson circled statement "f" on question 46. When the prosecution was asked to provide an explanation for striking Johnson, that was the first reason the prosecutor gave: "Ms. Johnson marked F on the questionnaire." On the subject of Johnson's attitude toward the death penalty, the prosecutor also noted an answer she gave during individual *voir dire*, in which she said: "I don't think the death penalty should be imposed on just any type of murder. . . . If you have somebody that went out there and just say committed a real heinous crime such as something Berdella did, something like that, okay, the death penalty should be imposed like that." The prosecutor explained that Berdella "was a mass murderer, very gruesome mass murderer."

In addition to Johnson's views on the death penalty, the prosecution cited various of her affiliations:

> She works for Ad Hoc [Group Against Crime, a community-based organization]. She has two brothers who were convicted themselves of robbery in the first degree. On her questionnaire, [she said] she was questioned herself about a murder that her nephew was involved in. She notes she is a friend of [criminal defense attorney] Doc Holliday.

The prosecutor concluded, "With that kind of baggage on her, but basically because of the F and then her answers to that, and her employment with Ad Hoc and her brothers' convictions for robbery, that's why we moved to strike her."

For reasons that are not well explained, the trial court determined that working for Ad Hoc and knowing Holliday were not race-neutral reasons for a strike. The trial court believed, however, that "[Johnson's] position on the death penalty, and . . . having the relative who has been tried [for murder] in Circuit Court here and also the fact that she knows or has other relatives that were tried for the crime of robbery . . .

-22-

present sufficient race-neutral reasons." On that basis, the court preliminarily overruled Taylor's objection. Defense counsel argued that the prosecution did not strike a "similarly situated" white juror, Charles Knoderer, who mentioned serial killers Ted Bundy and John Wayne Gacy during questioning, and who had a brother in prison. Upon hearing that Knoderer marked "d" on the questionnaire, however, the trial court made final its overruling of Taylor's objection, reiterating that "a sufficient race-neutral record has been made."

The Supreme Court of Missouri upheld the trial court's decision, stating it was "clear that the prosecutor gave race-neutral reasons with distinctions regarding the white venirepersons and the black venirepersons struck." *Taylor II*, 18 S.W.3d at 372. When it said that "the prosecutor gave race-neutral reasons" for striking Johnson, the supreme court necessarily rejected the trial court's assertion that Johnson's employment with Ad Hoc and her friendship with Holliday were *not* race-neutral reasons. Elsewhere in its opinion, the court explained that "[t]he prosecutor presented to the [trial] court that Mr. Holliday had been prosecuted by the Jackson County prosecutor's office, which was a race-neutral reason." *Id.* at 371 n.8. The supreme court did not elaborate on its conclusion regarding employment with Ad Hoc, but it is evident that the trial court misapplied the second step of the *Batson* analysis on this point, as there is no suggestion that employment with this organization is "peculiar to any race." *Purkett v. Elem*, 514 U.S. 765, 769 (1995) (per curiam) (internal quotation omitted).

Taylor asserts that the state supreme court's decision involved an unreasonable application of clearly established federal law, 28 U.S.C. § 2254(d)(1), because the court did not apply a proper mixed-motive analysis to the strike of Johnson. Citing our court's decision in *United States v. Darden*, 70 F.3d 1507, 1531 (8th Cir. 1995), Taylor contends that the supreme court unreasonably applied the law by failing to shift the burden of proof to the prosecution to show that it would have struck Johnson even without consideration of reasons that were not race-neutral. As the supreme

-23-

court found that all of the prosecution's reasons were race-neutral, however, there was no need for that court to consider whether and how mixed-motive analysis should apply to a *Batson* challenge.[5]

On the question whether the determination of the state courts that the prosecutor gave "sufficient race-neutral reasons" to strike Johnson was incorrect and unreasonable, we conclude that Taylor has not shown an entitlement to relief. The prosecutor stated that Johnson was struck "basically because of the F and then her answers to that, and her employment with Ad Hoc and her brothers' convictions for robbery." Taylor argued in the trial court that the prosecutor's reasons relating to Johnson's views on the death penalty were pretextual, comparing Johnson with Knoderer. But although both Johnson and Knoderer invoked the names of serial killers during individual questioning, Johnson marked "f" on the questionnaire – registering philosophical, moral, or religious opposition to the death penalty – while Knoderer marked "d." The prosecution struck every "f" juror on the final two panels except Nancy Pfeifer, whose answers to other questions showed her to be more accepting of the death penalty than an "f" answer implied. It was not incorrect or unreasonable for the state courts to conclude that Johnson's answer on the questionnaire, together with her responses about the death penalty during individual

_____

[5]In *Snyder*, the Supreme Court held that when discriminatory intent is a substantial or motivating factor for a peremptory strike, the prosecution must show, at a minimum, that the impermissible motive was not "determinative" before the strike can be sustained. 128 S. Ct. at 1212. Given the state supreme court's finding that the prosecutor's stated reasons for striking Johnson were race-neutral, we need not determine what sort of mixed-motive analysis, if any, was embodied in clearly established federal law at the time of Taylor's trial. *Compare, e.g.*, *Kesser v. Cambra*, 465 F.3d 351, 372-75 (9th Cir. 2006) (en banc) (Wardlaw, J., concurring), *with id.* at 381-84 (Rymer, J., dissenting).

questioning and her relationship with family members involved in serious crimes, led the prosecution to strike her.[6]

## C.

Edwina Kinsey was a prospective principal juror who marked "e" on the questionnaire. Addressing the trial court, the prosecutor gave the following explanation for striking her:

> [D]uring the death penalty qualification, your initial question is what are your views on the death penalty. She, without hesitation, said, "Personally, I'm opposed to the death penalty." That's the reason we're striking Ms. Kinsey. Also, it's a belief she has held for some time is what she stated to the Court.

The trial court commented that its notes "reflect[ed] that she was clearly a qualified juror but definitely much closer to the *Witt* end than to the *Morgan* end." The court determined that the prosecutor's justification was race-neutral, and preliminarily overruled Taylor's objection to the strike.

Defense counsel then compared Kinsey with white prospective juror David Robinson, arguing that while both circled "e" and expressed personal opposition to the death penalty, the prosecution struck only Kinsey. The prosecutor responded that there was a "distinction between these two." He explained that the two jurors responded differently when asked during individual *voir dire* about their feelings toward the death penalty: whereas the "first words right out of [Kinsey's] mouth" were that she was personally against the death penalty, Robinson "start[ed] off" by

---

[6]Taylor argues that the prosecutor's assertion that Johnson was acquainted with Holliday is unsupported by the record. Whether or not the prosecutor was mistaken about that point, the determination of the state courts was not unreasonable or contrary to clear and convincing evidence.

stating that the death penalty had "pros and cons." The trial court concluded that the prosecution had "presented sufficient race-neutral reasons," and made final its decision overruling Taylor's objection.[7] The Supreme Court of Missouri affirmed, again on the basis that it was "clear that the prosecutor gave race-neutral reasons with distinctions regarding the white venirepersons and the black venirepersons struck." *Taylor II*, 18 S.W.3d at 372.

Taylor maintains that the prosecution struck Kinsey because of her race. He relies on the fact that the prosecution did not strike two white prospective jurors whom he deems comparable to Kinsey. One is Robinson. On the questionnaire, Robinson marked "e." When asked during individual *voir dire* "what do you feel about the death penalty," Robinson answered, "I don't know. There are pros and cons about it." He continued, "I can't really answer that question right now. It just – how would I put that?" After the trial court assured him, "[y]ou can put it any way you want to put it," Robinson said, "In my beliefs I don't believe in it. In the law part of it I do believe in it. . . . So I've got a split right there." He said, "I'm just right in the middle," and rated himself a five on a scale of one to ten between life without parole and the death penalty.

Taylor argues that Robinson and Kinsey were similarly situated because both marked "e" and expressed comparable views on the death penalty. Taylor points out that Kinsey stated in follow-up questioning that she could consider imposing the death penalty, that she would not always vote for life imprisonment, and that as a juror she

---

[7]Taylor contends that the trial court misapplied *Batson* by concluding its analysis once it determined that the prosecutor offered race-neutral reasons, without proceeding to evaluate whether those reasons were credible. Our precedent holds, however, that an evaluation of credibility was implicit in the trial court's determination that "the State has presented sufficient race-neutral reasons" and its decision to "overrule the Batson challenge as it relates to Ms. Kinsey." *See Smulls*, 535 F.3d at 860, 863.

"would have to go along with" the death penalty "if it was [her] decision." According to Taylor, Kinsey ultimately adopted the same attitude toward the death penalty as Robinson – that is, both said essentially that they were capable of considering the death penalty under the law, although they were opposed to it in their personal beliefs.

Notwithstanding Kinsey's responses to follow-up questioning, the record still permits the finding of the state courts that the prosecution struck Kinsey for race-neutral reasons. When Kinsey was asked during individual *voir dire* how she felt about the death penalty, her immediate responses were noticeably different from Robinson's. Unlike Robinson, who acknowledged that the death penalty had "pros and cons," Kinsey stated unequivocally, "I personally am against the death penalty." In further contrast to Robinson – who expressed his views tentatively, stating at one point, "I don't know," and at another, "I can't really answer that question right now" – Kinsey gave reason to believe that her feelings were clear and settled. Indeed, she made known that she had been personally opposed to the death penalty "for some time." Although Kinsey eventually said that she could consider the death penalty, she never acknowledged that the death penalty had any "pros," as Robinson did.

Even if we assume, moreover, that Kinsey's later responses expressed views similar to Robinson's, it was not unreasonable for the state courts to credit the prosecutor's perception of a race-neutral distinction between these jurors based on their initial answers. Even if two jurors ultimately make comparable statements after the process of questioning and rehabilitation by counsel, the prosecution is entitled to take into account the entire range of statements, including the initial positions stated by the jurors. Here, the prosecutor noted that Robinson "start[ed] off" by stating that the death penalty had "pros and cons," whereas the "first words right out of [Kinsey's] mouth" were that she was personally against the death penalty. The prosecution permissibly favored Robinson over Kinsey, because the difference in their initial responses may have reflected the relative depth of their feelings toward the death penalty, which in turn could have influenced deliberations over the appropriate

-27-

punishment. Attorneys often make distinctions between prospective jurors based on instincts formed by limited information, and substantial grounds for distinguishing among jurors are not always available. *See Miller-El*, 545 U.S. at 252. Even fine race-neutral distinctions between them are a permissible basis for strikes, and the state courts reasonably credited the prosecutor's articulated distinction between Kinsey and Robinson.

Taylor also compares Kinsey with Samantha Edmondson, a white prospective juror who circled "d" on the questionnaire. During individual *voir dire*, Edmondson was asked "what are your feelings about the death penalty," and her response was "I think I generally believe in that, but the more I think about actually imposing that, I think I could, based on facts and things like that, but I think it would have an unfortunate effect on me." Edmondson clarified that she thought she would experience an "unfortunate effect" "[e]ither way," regardless of whether she voted for the death penalty or life imprisonment. According to Taylor, Kinsey's responses during individual questioning were substantially similar to Edmondson's. But when asked exactly the same question – "What are your feelings about the death penalty?" – Kinsey gave a completely different answer: "I personally am against the death penalty." The prosecution's decision to strike Kinsey but not Edmondson thus does not give rise to an inference of discriminatory intent.

On the record as a whole, Taylor has not presented clear and convincing evidence to rebut the presumptive correctness of the state-court determination that the prosecution's race-neutral reasons for striking Kinsey were credible. Nor has he demonstrated that that state-court determination was unreasonable. Because the record does not show that there was "no permissible alternative but to reject the prosecutor's race-neutral justifications," *Collins*, 546 U.S. at 341, we reject Taylor's claim that the strike of Kinsey entitles him to relief.

D.

Bonnye Brown was the fourth and final black prospective principal juror peremptorily struck by the prosecution. In defending the strike, the prosecutor pointed to Brown's views on the death penalty: "Ms. Brown, during individual voir dire, stated that, 'My first choice is life without parole.' 'Very, very extreme to give the death penalty.' She was definite on that." The prosecutor also cited one of Brown's responses on the questionnaire. In answer to a question asking whether she had "ever witnessed an act of serious violence or abuse," Brown had written, "no but I has [sic] seen the results of someone being abused." The prosecutor said that he "locked onto" this answer because he anticipated the defense to rely on the abuse Taylor experienced as a child as a mitigating circumstance at sentencing.

The trial court first found race-neutral both of the prosecution's stated reasons for striking Brown – her feelings toward the death penalty and her witnessing the results of abuse. After the court preliminarily overruled Taylor's objection to the strike, defense counsel argued that the prosecution's reasons applied just as well to white prospective jurors whom the prosecution did not strike. The trial court considered those comparisons, and told defense counsel, "You've convinced me this abuse thing is not a particularly persuasive reason to strike this woman." The court explained, "I'm not saying her abuse comments aren't race-neutral or capable of consideration, but it's clear to me there are a variety of folks that said equally as poignant statements as her."

The trial court rejected the *Batson* challenge after finding credible the prosecution's other reason for striking Brown. Using the transcript of individual *voir dire* to refresh its recollection of Brown's answers, the trial court noted, "She clearly had some pretty definite statements that she had some severe hesitations about the death penalty. I had to rehabilitate her and the like." Although Brown marked "c" and "d" on the questionnaire, the trial court described "her li[v]e performance" during

questioning as "probably an F, G, or F, something like that." Accordingly, the trial court made final its decision to sustain the strike.

In resolving this challenge, the trial court remarked that it was "personally troublesome" to have a death penalty case with a black defendant and an "all white jury," but concluded that a race-neutral reason for the strike had been established. The court reasoned that the only way to disallow the strike would be "to not follow what the law is." The Supreme Court of Missouri affirmed, noting the trial court's findings that the prosecution had not struck white jurors who had witnessed abuse, but that Brown had shown hesitation toward voting for the death penalty. *Taylor II*, 18 S.W.3d at 372.

Taylor contends that the record does not support the trial court's finding that the prosecution struck Brown because of her views on the death penalty. Taylor concedes that Brown stated during individual questioning that her "first choice would always be life without parole." Taylor maintains, however, that the prosecutor mischaracterized Brown's statement by implying that it reflected reservations about the death penalty. According to Taylor, when Brown said that her "first choice would always be life without parole," she meant merely that in accordance with Missouri law, she would not vote for the death penalty unless the prosecution proved beyond a reasonable doubt at least one of the statutory aggravating circumstances. *See* Mo. Rev. Stat. § 565.030.4. Taylor argues that the prosecutor's mischaracterization of Brown's statement undermines the trial court's finding that the prosecutor's basis for striking Brown was credible.

Brown's statement, however, is fairly understood to capture more than the prosecution's burden of proof at sentencing. Under Missouri law, jurors have discretion to impose a sentence of life imprisonment without parole, even when the prosecution proves one of the statutory aggravating circumstances. *See id.* It was certainly reasonable for the prosecutor to treat Brown's statement that her "first choice

-30-

would always be life without parole" as an indication of how she would exercise that discretion. Indeed, that statement was not the only one she made suggesting that she would be reluctant to impose the death penalty. As the prosecutor noted, Brown also stated that she would vote for the death penalty only in a "very, very extreme" case. She emphasized that she "would always lean towards life unless it is that very extreme situation," and that "death would be [her] last choice." The trial court agreed with the prosecutor that Brown made "some pretty definite statements that she had some severe hesitations about the death penalty." That the prosecutor cited Brown's statement about her "first choice" as an example of her views on the death penalty is thus not indicative of pretext.

Taylor has not presented clear and convincing evidence that the prosecution's race-neutral reason relating to Brown's views on the death penalty was pretextual, or shown that the decision of the state courts was based on an unreasonable determination of the facts. He is therefore not entitled to relief on this claim.

E.

Taylor's remaining arguments concern the prosecution's use of peremptory strikes to remove two black women who were prospective alternate jurors. Our court held in *Carter v. Kemna*, 255 F.3d 589 (8th Cir. 2001), that a state court did not unreasonably apply clearly established federal law by allowing a judgment to stand, despite the improper exclusion of an alternate juror, where no alternate was called to deliberate on the verdict. *Id*. at 592. We reasoned that "lower courts disagree about whether *Batson* requires reversal of a conviction when an alternate juror is improperly excluded, but no alternate joins the deliberating jury," *id.*, and the Supreme Court had not decided whether harmless-error analysis is applicable in that situation. In Taylor's case, none of the alternate jurors in the second penalty phase joined the deliberating jury. *Carter* would thus seem to resolve Taylor's claims for relief based on peremptory strikes of prospective alternate jurors. The State, however, does not raise

this point. Because we conclude that the factual determinations of the state courts are otherwise entitled to stand, we need not give further consideration to the possible applicability of *Carter.*

The prosecution exercised one of its two peremptory strikes against prospective alternates to remove Latricia Wilson. Following defense counsel's objection, the prosecutor explained:

> Wilson . . . marked F on her questionnaire. Only one of the 38 jurors who marked F survived our strikes for our peremptory challenges, and that's [Nancy Pfeifer], and that's because her answers on individual [*voir dire*], in my opinion, made her more of a C or B type juror according to the questionnaire. Also, [Wilson's] answers, religiously she said she would be very hesitant.

Recalling Wilson's answers during individual questioning, the trial court stated: "I think any objective view of her testimony is that she clearly had reservations about the death penalty in my view, not such that she could be stricken for cause, but she did have such reservations. And I thought they were clearly noticeable." The trial court determined that the prosecution's reasons for striking Wilson were race-neutral, and preliminarily overruled Taylor's objection. After defense counsel reasserted the objection without further argument, the trial court made its ruling final. The Supreme Court of Missouri affirmed the trial court's decision, concluding that Taylor "failed to establish that the State's justification for striking [Wilson] was mere pretext." *Taylor II*, 18 S.W.3d at 371-72.

In challenging this conclusion, Taylor compares Wilson with David Robinson, a white juror who was not struck by the prosecution, but who Taylor contends had similar reservations about the death penalty. We are not convinced that the comparison with Robinson demonstrates that the determination of the state courts was incorrect and unreasonable. Wilson marked "f" on the questionnaire. Consistent with

that answer, Wilson expressed religious opposition to the death penalty during individual *voir dire*. She said, "religiously I don't think that the death penalty is a good form of punishment," and thought that her religious beliefs might well affect her weighing of the case. Robinson, by contrast, marked "e" on the questionnaire. During individual questioning about the death penalty, Robinson portrayed himself as a middle-of-the-road juror: "In my beliefs I don't believe in it. In the law part of it I do believe in it. . . . So I've got a split right here." He stated firmly that he could separate his personal beliefs from the law, expressing "no doubt in [his] mind" that he could consider both punishment options. On this record, it was reasonable for the state courts to believe that the prosecution distinguished Wilson from Robinson based on these answers. Accordingly, we conclude that the state-court determination that the prosecution's race-neutral reasons for striking Wilson were credible was neither incorrect nor unreasonable.

## F.

Cecelia Smith was the other prospective alternate whom the prosecution peremptorily struck. Of the eight prospective alternates, the prosecutor explained, "we struck the two who marked lowest down towards leaning towards life without parole": Wilson, who marked "f," and Smith, "who marked D and E." The prosecutor gave as additional reasons for striking Smith that she knew Charles Brown, a criminal defense attorney, and that she stated during individual *voir dire* that "she would lean towards life without parole."

The trial court determined that the prosecution's reasons were race-neutral and made a preliminary ruling denying Taylor's *Batson* challenge. Defense counsel compared Smith with Jennifer Tartaglia, a white juror who chose "e" and knew a criminal defense attorney, but who was not struck by the prosecution. The prosecutor disputed the significance of the comparison, pointing out that he could not have struck Tartaglia instead of Smith because Tartaglia was on a different panel, among the

-33-

prospective *principal* jurors. After considering these arguments, the trial court issued a final ruling denying Taylor's challenge. That ruling was upheld by the Supreme Court of Missouri, which said it was "clear that the prosecutor gave race-neutral reasons with distinctions regarding the white venirepersons and the black venirepersons struck." *Taylor II*, 18 S.W.3d at 372.

Taylor makes two arguments in support of setting aside the state-court determination that the prosecution's strike of Smith was not racially motivated. His first contention is that the prosecutor's explanation for striking Smith fails on its own terms, because Smith was not one of two prospective alternates who seemed least inclined to vote for the death penalty. Based on the questionnaire, Taylor contends, the prosecution should have struck a white alternate named Rebecca Hadjian instead of Smith. In answer to question 46, Hadjian declined to choose any of the eight representative statements about the death penalty. Instead, she marked "i," for "None of the above," and wrote as an explanation, "I am bias [sic], depends on the type of crime and the conviction." Taylor argues that by "bias," Hadjian actually meant "unbiased," and this does seem to be the most likely meaning in view of Hadjian's statements during individual *voir dire*. But we do not see how Hadjian's answer shows that she was less willing to impose the death penalty than Smith. If Hadjian was "unbiased" toward the death penalty, then her views essentially tracked statement "d," which expressed no opinion in favor of or against the death penalty. All the other prospective alternates, except Wilson, marked "d." But in addition to "d," Smith marked "e," indicating that she was "generally against" the death penalty. That answer made Smith appear less inclined to vote for the death penalty than every other prospective alternate except Wilson. The state courts thus had a sound basis to credit the prosecutor's assertion that it struck "the two who marked lowest down" on the questionnaire, regardless of race.

Taylor's other contention is that knowing Charles Brown was not a credible reason for striking Smith, given that the prosecution did not strike Tartaglia and

-34-

Pamela Andersen, two white jurors who also knew criminal defense attorneys. These comparisons do not persuasively undermine the credibility of the prosecution's race-neutral explanation for striking Smith. That Smith knew a criminal defense attorney was only a secondary factor in the prosecution's decision to strike her. The determinative factor, according to the prosecutor, was that she marked "d" and "e" on the questionnaire, and testified that she would lean toward life without parole. In addition, Tartaglia and Andersen were prospective principal jurors, and the prosecution could not have challenged them instead of Smith. We therefore conclude that the state-court finding of no purposeful discrimination in the prosecution's strike of Smith was not incorrect or unreasonable.

\*     \*     \*

For the foregoing reasons, the judgment of the district court is affirmed.

_____