# United States Court of Appeals

## For the Eighth Circuit

_____

No. 11-1092

_____

Kimber Edwards

*Petitioner - Appellant*

v.

Donald Roper

*Respondent - Appellee*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: January 10, 2012
Filed: August 20, 2012

_____

Before MURPHY, BYE, and COLLOTON, Circuit Judges.

_____

COLLOTON, Circuit Judge.

Kimber Edwards was convicted of first-degree murder and sentenced to death in a Missouri trial court. The Supreme Court of Missouri affirmed the conviction and sentence on direct appeal, *State v. Edwards* (*Edwards I*), 116 S.W.3d 511 (Mo. 2003), and later affirmed the denial of Edwards's motion for postconviction relief. *Edwards v. State* (*Edwards II*), 200 S.W.3d 500 (Mo. 2006). Edwards filed a petition for writ

of habeas corpus under 28 U.S.C. § 2254, raising thirteen grounds for relief. The district court[1] denied the petition, but granted a certificate of appealability on two of Edwards's claims. Edwards appeals the denial of habeas relief on these two grounds, as well as the district court's denial of his motion for funds to conduct a mental examination. We affirm.

I.

Edwards was prosecuted for first-degree murder in the murder-for-hire killing of his ex-wife, Kimberly Cantrell. Edwards and Cantrell divorced in 1990. Between March 1999 and March 2000, Edwards failed to pay child support for the couple's daughter, and he was indicted for felony nonsupport. Days before a court appearance in the nonsupport case, family members found Cantrell's dead body. She had been shot twice in the head.

Cantrell's neighbor, Christopher Harrington, told police that he saw a man with a black backpack knocking on Cantrell's door on the day before her body was discovered. Harrington later identified the man as Orthel Wilson, a tenant in one of Edwards's rental properties. In Wilson's apartment, officers found a backpack matching the one described by Harrington. Wilson was charged with first-degree murder, and he implicated Edwards in the crime. Wilson took police to a vacant building where he had hidden the murder weapon, and officers found a gun and ammunition.

Police interviewed Edwards, who confessed that he had agreed to pay an individual named "Michael" $1,600 to kill Cantrell. Edwards denied that "Michael" was actually Wilson, but stated that "Michael" may have involved Wilson in the crime. The State charged Edwards with first-degree murder.

_____

[1]The Honorable Carol E. Jackson, United States District Judge for the Eastern District of Missouri.

During jury selection at Edwards's trial, the prosecution exercised peremptory strikes against the three remaining black members of the venire: Ector Robinson, Laverne Evans, and Ronald Burton. Edwards, who is black, objected to the strikes based on *Batson v. Kentucky*, 476 U.S. 79 (1986). The prosecutor responded by offering race-neutral reasons for the strikes. The trial court overruled Edwards's objections.

In the guilt phase of his trial, Edwards testified that he had no involvement in Cantrell's death and that his confessions to the contrary were false. The jury found Edwards guilty of first-degree murder.

Edwards chose not to testify again in the penalty phase of his trial, and he requested that the trial court give the jury a "no-adverse-inference" instruction. The court denied the request. In the penalty phase, the prosecution offered the testimony of Cantrell's sister and brother regarding the impact of Cantrell's death on her family. Edwards offered testimony from nine family members, friends, and coworkers, who testified regarding Edwards's character and childhood and asked for mercy.

The jury found one statutory aggravating circumstance—that Edwards had hired Wilson and/or "Michael" to murder Cantrell—and recommended a sentence of death. The court sentenced Edwards to death.

On direct appeal, Edwards argued that the trial court erred in overruling his *Batson* challenges with respect to prospective jurors Evans and Burton. He also argued that the court erred in denying his request for a no-adverse-inference instruction and that the prosecutor improperly commented on his failure to testify in the penalty phase. The Supreme Court of Missouri rejected Edwards's claims and affirmed the conviction and sentence. *Edwards I*, 116 S.W.3d at 550.

In 2007, Edwards filed a petition for writ of habeas corpus under 28 U.S.C. § 2254. In his petition, Edwards alleged that the prosecution exercised peremptory strikes against Evans and Burton based on their race, in violation of the Equal Protection Clause of the Fourteenth Amendment. He also alleged that the trial court's failure to give a no-adverse-inference instruction and the prosecutor's penalty phase closing argument violated his rights under the Due Process Clause. The district court denied relief, but granted Edwards a certificate of appealability on these claims.

## II.

We review petitions for writ of habeas corpus under the standards set forth in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Because Edwards's claims were "adjudicated on the merits in State court proceedings," he is entitled to relief only if he shows that the adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* § 2254(d)(2).

## III.

"[T]he Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race." *Batson*, 476 U.S. at 89. *Batson* established a three-step process for evaluating claims that a prosecutor exercised peremptory strikes in violation of the Equal Protection Clause:

> First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race. Second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question. Third, in light of the parties'

-4-

submissions, the trial court must determine whether the defendant has shown purposeful discrimination.

*Miller-El v. Cockrell* (*Miller-El I*), 537 U.S. 322, 328-29 (2003) (citations omitted).

A claim that the state courts misapplied the *Batson* framework is a legal question subject to the standard set forth in § 2254(d)(1). *Stenhouse v. Hobbs*, 631 F.3d 888, 891 (8th Cir. 2011). A contention that the state courts unreasonably determined that the prosecutor's strikes were not motivated by race is a factual determination subject to the standard set forth in § 2254(d)(2). *Id.* "AEDPA further mandates that a state court's factual determinations 'shall be presumed to be correct,' and that the petitioner has 'the burden of rebutting the presumption of correctness by clear and convincing evidence.'" *Id.* (quoting 28 U.S.C. § 2254(e)(1)).

## A.

We first consider Edwards's claims regarding the peremptory strike of Evans. Edwards contends that the decision of the Supreme Court of Missouri rejecting a challenge to the strike of Evans was based on an unreasonable determination of the facts, and that it was contrary to, or involved an unreasonable application of, *Batson* and related decisions of the Supreme Court.

In response to Edwards's *Batson* objection, the prosecutor explained that he struck Evans because she believed that her niece was a "victim of the system" and had been treated unfairly by the police. Based on Evans's responses during *voir dire*, the prosecutor stated his belief that Evans had "some distrust of courts and prosecutors." Defense counsel responded by noting the prosecution's failure to strike a white juror, Kristin Tincu, who stated during *voir dire* that her nephew was in prison for burglary. The prosecutor countered by arguing that Tincu did not believe her nephew had been persecuted by the police, but rather thought "the system was too

-5-

lenient" on the defendant in a manslaughter case in which Tincu was a witness. The trial court agreed and overruled Edwards's *Batson* objection. The Supreme Court of Missouri affirmed, holding that the trial court did not clearly err in rejecting the *Batson* challenge. *Edwards I*, 116 S.W.3d at 525.

Edwards contends that the state court's decision is contrary to and involved an unreasonable application of *Batson*, because it rests on an "implicit finding" that a *Batson* objection fails unless an allegedly similarly situated white juror is "exactly identical" to the stricken juror. He also argues that the state supreme court's determination that Evans and Tincu were not similarly situated was an unreasonable determination of the facts.

Striking a black panelist for reasons that apply "just as well to an otherwise-similar nonblack who is permitted to serve" is evidence tending to prove purposeful discrimination. *Miller-El v. Dretke* (*Miller-El II*), 545 U.S. 231, 241 (2005). The state supreme court recognized that a "key factor to be considered in determining pretext is the existence of similarly situated white jurors who were not struck." *Edwards I*, 116 S.W.3d at 525 (internal quotation and alterations omitted). Edwards argues, however, that the state court's standard for similarity was too rigorous. He relies on the Supreme Court's statement in *Miller-El II* that a "*per se* rule that a defendant cannot win a *Batson* claim unless there is an exactly identical white juror would leave *Batson* inoperable; potential jurors are not products of a set of cookie cutters." 545 U.S. at 247 n.6. Because *Miller-El II* had not been decided at the time of Edwards's trial and appeal, his contention that the Supreme Court of Missouri unreasonably applied federal law "as determined by the Supreme Court of the United States" is without merit. *Broom v. Denney*, 659 F.3d 658, 663 (8th Cir. 2011).

In any event, the record does not establish that the state supreme court thought two jurors must be exactly identical before differential treatment may be considered in support of a *Batson* claim. The state court, rather, reasonably upheld the trial

court's finding that the prosecutor perceived a race-neutral distinction between the jurors.

During *voir dire*, Evans stated that her niece had been arrested and jailed for three months because her niece's boyfriend was involved in a crime and her niece could not account for her whereabouts. After the boyfriend confessed to the crime, Evans explained, the police "just let [my niece] go" and "did not say anything else to my niece." According to Evans, her niece was "traumatized" by the experience and had to see a psychologist. Although Tincu stated during *voir dire* that her nephew had been in prison for five years for burglary, she also explained that she was a witness in a vehicular manslaughter case in which the defendant was released after serving seven years in prison. Tincu stated that she was upset that her nephew was treated too harshly and the other individual too leniently, and that she was disturbed by the disparity in treatment given the relative seriousness of one of the offenses. After defense counsel proffered Tincu as similarly situated to Evans, the prosecutor argued that Tincu did not feel that her nephew was persecuted by the police, but that "the system was too lenient on somebody."

The record supports the prosecutor's explanation that Evans, in light of her niece's experience with the criminal justice system, had some distrust of courts and prosecutors. When asked if she felt that her niece was treated unfairly, Evans stated that her niece was "traumatized" by the experience and had to see a psychologist. Tincu, on the other hand, expressed concern about a perceived disparity in punishment between her nephew and another man charged with a different crime. Unlike Evans, who complained about her niece's arrest, jailing, and subsequent unexplained release, Tincu's responses did not clearly suggest a belief that her nephew had been improperly arrested or jailed. Edwards stresses that Evans stated that she could be fair to both sides, but "peremptory strikes need not meet the standard of a strike for cause." *Stenhouse*, 631 F.3d at 892. Given the respective *voir dire* testimony of Evans and Tincu, the state courts reasonably credited the

prosecutor's asserted perception of a race-neutral distinction between the jurors. "Even fine race-neutral distinctions between [jurors] are a permissible basis for strikes," *Taylor v. Roper*, 577 F.3d 848, 866 (8th Cir. 2009), and Edwards has not shown that "it was unreasonable to credit the prosecutor's race-neutral explanations for the *Batson* challenge." *Rice v. Collins*, 546 U.S. 333, 338 (2006).

Edwards also argues that the Supreme Court of Missouri's decision is contrary to and an unreasonable application of *Batson*, because the court substituted reasons to justify the strike that were not offered by the prosecution. After discussing the *voir dire* responses of Evans and Tincu, and noting the prosecutor's explanation that he understood Tincu "not to be mad at the court system, . . . just unhappy with how her nephew had been treated," the court stated that, "[m]oreover," the defense had tried to strike Tincu for cause, because she said during *voir dire* that she might hold it against Edwards if he did not testify. *Edwards I*, 116 S.W.3d at 525. The court also referred to Tincu's testimony that two of her friends were "carjacked, raped, shot, and left for dead," and expressed concern that she might have difficulty keeping this experience from affecting her view of the case if it involved a shooting. *Id.*

These additional observations, Edwards argues, were contrary to the command of federal law that reviewing courts must not interject race-neutral reasons that were not expressed by the prosecutor. He relies again on *Miller-El II*, a case that was decided two years after the state supreme court's decision in this case, and thus not clearly established law for purposes of this case. In *Miller-El II*, the Court said that "[i]f the [prosecutor's] stated reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have shown up as false." 545 U.S. at 252. Even assuming this rule was clearly established law in 2003, the prosecutor's stated reason for striking Evans (and not striking Tincu) is supported by the record. The state court's determination that the strike was not motivated by race was not an unreasonable determination of the facts. This is not a case where the prosecutor's stated reason for the strike did not "hold

up." The court's mention of two additional facts does not render its decision contrary to, or an unreasonable application of, clearly established federal law. *See Taylor v. Sisto*, 449 F. App'x 665, 668 n.3 (9th Cir. 2011).

B.

We next consider Edwards's claims concerning the peremptory strike of prospective juror Burton. Edwards contends that the decision of the Supreme Court of Missouri upholding the strike was based on an unreasonable determination of the facts, and that it was contrary to, or involved an unreasonable application of, clearly established federal law.

In response to Edwards's *Batson* challenge, the prosecutor stated that he struck Burton because he was a postal worker. The prosecutor described the post office as "one of the biggest bureaucratic organizations in the world," and noted that postal workers have to follow "so many rules and regulations." The prosecutor stated that a postal worker might see jury service, particularly in a capital case, as a chance to "not follow the rules." The prosecutor also pointed out that he struck "anything close to a postal worker," including prospective jurors Robert Piazza, who worked for Federal Express, and Catherine Williams, whose spouse was a letter carrier. Defense counsel, attempting to show pretext, noted the prosecutor's failure to strike two jurors with "bureaucratic" occupations: Daniel Meehan, who worked for the City of Clayton, and Thomas Schumacher, whom defense counsel mistakenly believed was a retired member of the military.[2] After hearing the prosecutor's response, the trial court overruled Edwards's objection. The Supreme Court of Missouri affirmed,

---

[2]The Supreme Court of Missouri noted defense counsel's mistaken belief as to Schumacher's occupation, *Edwards I*, 116 S.W.3d at 526, and the record reflects that Schumacher actually worked for the National Archives.

holding that the "trial court's determination that the strike of Juror Burton was not pretextual was not clearly erroneous." *Edwards I*, 116 S.W.3d at 528.

Edwards argues that the state court decision is contrary to and involves an unreasonable application of *Batson*, because the court failed to consider statistical evidence showing that 50% of postal workers in St. Louis County are black, as compared to just 18% of St. Louis County residents. This evidence should have been considered, Edwards contends, at the second step of the *Batson* analysis to determine whether the prosecutor articulated a race-neutral reason for the strike. This statistical evidence, however, was not "presented in the State court proceeding," 28 U.S.C. § 2254(d)(2), and Edwards is not entitled to relief based on the state court's failure to consider evidence that was not before it. *See Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011); *cf. Miller-El II*, 545 U.S. at 241 n.2. In any event, the issue at the second step is the "facial validity" of the prosecutor's explanation. Unless a discriminatory intent is inherent in the explanation, the proffered reason will be deemed race-neutral. *Purkett v. Elem*, 514 U.S. 765, 768 (1995) (per curiam). The prosecutor's explanation was race-neutral, *see Williams v. Groose*, 77 F.3d 259, 261 (8th Cir. 1996), and the state courts did not act contrary to or unreasonably apply *Batson* by proceeding to the third step of the *Batson* inquiry. *See Purkett*, 514 U.S. at 767-68.

Edwards also contends the state supreme court made an unreasonable determination of the facts when it stated that the "trial court found that the strike [of Burton] was not pretextual and denied the challenge." *Edwards I*, 116 S.W.3d at 526. According to Edwards, this statement mistakenly indicates that the trial court made "explicit findings" regarding the prosecutor's credibility. The trial court, in overruling Edwards's objection, stated only that "[t]he *Batson* challenge will be denied as to [Burton]." The denial of a *Batson* challenge, however, "is itself a finding at [*Batson's*] third step that the defendant failed to carry his burden of establishing that the strike was motivated by purposeful discrimination," *Smulls v. Roper*, 535

F.3d 853, 863 (8th Cir. 2008) (en banc), and it "includes an implicit finding that the prosecutor's explanation was credible." *Taylor*, 577 F.3d at 856. Thus, the state supreme court's finding was not an unreasonable determination of the facts.

Edwards argues that he is entitled to relief under 28 U.S.C. § 2254(d)(1) and (d)(2) because the Supreme Court of Missouri "ignored the fact that the prosecution could not explain how Burton's occupation was related to the facts of the case." In response to the *Batson* objection, the prosecutor stated that postal workers "are told everyday that there are so many rules and regulations that they have to follow." In a capital case, the prosecutor explained, where there are "more rules and regulations at the trial," a postal worker might see it as an opportunity to "not follow the rules" and to say, "I do that twenty-four hours a day, seven days a week, I'm not going to do that." The prosecutor also described his experience in a prior trial where, despite "overwhelming" evidence of guilt, he felt that a postal worker juror delayed a guilty verdict for eight hours. In light of this record, the state supreme court reasonably found that "the prosecutor did not merely state that he struck [Burton] because he was a postal worker." *Edwards I*, 116 S.W.3d at 528. Rather, the prosecutor cited a prior negative experience with a postal worker juror, and "gave specific reasons why he felt postal workers would not be good jurors." *Id.* Edwards has not shown that the state court's decision was contrary to or an unreasonable application of clearly established federal law. Nor has he shown that the state court's decision was based on an unreasonable determination of the facts.

The Supreme Court of Missouri also found that the lack of pretext was "buttressed" by the prosecution's use of strikes against the two jurors "most similar" to Burton: Piazza, a Federal Express worker, and Williams, who was married to a letter carrier. *Edwards I*, 116 S.W.3d at 528. Edwards argues, however, that Piazza and Williams were not similarly situated to Burton because their *voir dire* answers, which allegedly indicated a pro-defense bias, gave the prosecutor an independent reason to strike them. Williams stated that her husband's aunt and uncle had been

-11-

murdered and the perpetrators were executed. She explained that she had "seen the devastation and despair on both sides for the victim and for the people that committed the crime." Piazza stated that he could consider a sentence of life imprisonment even if the defense presented no evidence of mitigating factors. Notwithstanding these statements, the record still permits the finding of the state courts that the prosecution struck Burton for race-neutral reasons. Piazza and Williams, while not employed by the postal service, either worked in or were married to individuals with mail-related occupations, and Edwards identifies no similarly-situated white juror that the prosecution failed to strike. The record thus supports the state supreme court's finding that Piazza and Williams were "most similar" to Burton. *Edwards*, 116 S.W.3d at 528. "'[S]imilarly situated' for purposes of justifying the use of peremptory strikes does not require similarity in all respects." *Smulls*, 535 F.3d at 865. The jurors "are similar enough that we cannot say on this record that the prosecutor's stated reason—[Burton's] occupation—was a pretext for racial discrimination." *Id.*

Edwards also suggests that he is entitled to relief because the state supreme court "overlooked and ignored" what he characterizes as "pattern and practice" evidence of racial discrimination by St. Louis County prosecutors. Edwards contends that "the vast majority of *Batson* reversals in the last twenty-five years from Missouri appellate courts arose from St. Louis County." He cites seven decisions from Missouri appellate courts since 1988 finding that a *Batson* violation occurred. He also points to a 1990 newspaper article regarding a former assistant St. Louis County prosecutor who claimed that other attorneys advised him to strike blacks from juries. While not going so far as to suggest that "St. Louis County had a 'specific policy' of excluding African-Americans from criminal juries," Edwards claims that this evidence, coupled with the particular evidence in his case, shows that the prosecutor's explanations for the strikes are "unworthy of belief."

"Whether a peremptory strike was motivated by race is ultimately a question of fact," *Taylor*, 577 F.3d at 854, and state court factfinding must be assessed "in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Likewise, "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen*, 131 S. Ct. at 1398. Edwards's "pattern and practice" evidence was not presented in the state court proceedings, and this is not a case where Edwards simply offers new theories about evidence that was presented to the state courts. *Cf. Miller-El II*, 545 U.S. at 241 n.2. On the record that was before the state courts, the state supreme court did not unreasonably apply clearly established federal law by rejecting Edwards's objection to the strike. *See Cullen*, 131 S. Ct. at 1398.

Finally, Edwards argues that the Supreme Court of Missouri unreasonably applied *Batson* because it failed to consider that the prosecution struck all three remaining black prospective jurors.[3] *Batson* said that a "pattern" of strikes against black jurors might give rise to an inference of discrimination that would establish a *prima facie* case of discrimination at step one of the analysis. 476 U.S. at 97. Edwards has not shown that the state supreme court failed to consider this fact. The state court assumed that Edwards made a *prima facie* case and resolved the *Batson* challenges at step three of the analysis. A state court, moreover, "need not make detailed findings addressing all the evidence before it." *Miller-El I*, 537 U.S. at 347. "[F]ederal law has never required explicit fact-findings following a *Batson* challenge, especially where a prima facie case is acknowledged and the prosecution presents specific nondiscriminatory reasons on the record." *Smulls*, 535 F.3d at 860. The Supreme Court of Missouri did not unreasonably apply clearly established federal law

---

[3]With respect to the third stricken juror, Robinson, the prosecutor explained that Robinson thought that the "police lied," that his nephew was "persecuted," and that the death penalty was "not applied equally in our society." The trial court found that the prosecutor did not act with discriminatory purpose in striking Robinson, and Edwards did not appeal the trial court's decision on that point.

-13-

by failing to mention specifically that the prosecution struck the three remaining black jurors.

IV.

We turn now to Edwards's claim that his rights under the Self-Incrimination Clause of the Fifth Amendment, as incorporated by the Fourteenth, were violated by two "independent, but interrelated events."

A.

Edwards argues that the prosecutor improperly commented on his failure to testify when, during the penalty phase summation, the prosecutor stated:

> Ladies and gentlemen of the jury, we have just heard quite a bit about Kimber Edwards'[s] life both before the time of his arrest and after in terms of his contacts with his family and his friend.
>
> What's the one thing we haven't heard about that Kimber Edwards has expressed to anyone, remorse. Any remorse, any sadness about the killing of Kimberly Cantrell and why haven't you heard about it? Because he hasn't obviously expressed it to anybody.

The Supreme Court of Missouri rejected Edwards's claim, holding that the statement was a reference to Edwards's lack of remorse and therefore relevant to his character, which was "an important issue in deciding punishment." *Edwards I*, 116 S.W.3d at 547. Edwards contends that state supreme court's decision was contrary to and an unreasonable application of *Griffin v. California*, 380 U.S. 609 (1965), as well as an unreasonable determination of the facts.

-14-

*Griffin* held that the Fifth Amendment forbids direct prosecutorial comment on the accused's failure to testify. 380 U.S. at 615. In that case, the prosecutor argued to the jury that the defendant knew the facts, but had "not seen fit to take the stand and deny or explain." *Id*. at 611. The Court held that the prosecutor's comment violated the accused's right against self-incrimination. The prosecutor's statement in this case was not a direct comment on Edwards's failure to testify.

Citing *Lesko v. Lehman*, 925 F.2d 1527 (3d Cir. 1991), and *Laird v. Horn*, 159 F. Supp. 2d 58 (E.D. Pa. 2001), Edwards argues in substance that the prosecutor's argument was an indirect comment on Edwards's silence, and that it was calculated to induce the jury to draw an adverse inference from the failure to testify. This contention would not fare well even on direct appeal in a federal case. The prosecutor's comments are more naturally understood as a reference to Edwards's evidence at the penalty phase, where no witness testified that Edwards had expressed remorse or sadness to any of the defense witnesses. But this claim arises under AEDPA, and it fails for a more basic reason: the Supreme Court has never clearly established that a prosecutor may not comment on the evidence in a way that indirectly refers to the defendant's silence. *Diggs v. Hulick*, 236 F. App'x 212, 215 (7th Cir. 2007); *Yancey v. Gilmore*, 113 F.3d 104, 106-07 (7th Cir. 1997). The Supreme Court of Missouri thus did not unreasonably apply clearly established federal law by rejecting Edwards's claim based on *Griffin*.

B.

Edwards also claims that the trial court's refusal to give a no-adverse-inference instruction during the penalty phase violated his rights under the Fifth and Fourteenth Amendments. At trial, Edwards's proffered an instruction based on a Missouri model instruction, which provided: "Under the law, a defendant has the right not to testify. No presumption of guilt may be raised and no inference of any kind may be drawn from the fact that the defendant did not testify." Edwards's proposal modified this

instruction by removing the words "of guilt." The trial court refused the instruction, reasoning that the words "of guilt" were "substantive" and indicated that the instruction "only applies to the guilt phase."

On direct appeal, the Supreme Court of Missouri held that the trial court erred in concluding that a defendant is entitled to a no-adverse-inference instruction only in the guilt phase. *Edwards I*, 116 S.W.3d at 540. Citing *Carter v. Kentucky*, 450 U.S. 288 (1981), and *Estelle v. Smith*, 451 U.S. 454 (1981), the state supreme court reasoned that "a defendant's right not to have adverse inferences drawn from his exercise of his privilege against self-incrimination applies to the penalty as well as to the guilt phase of a capital murder trial." 116 S.W.3d at 540. Applying *Chapman v. California*, 386 U.S. 18 (1967), however, the court determined that the error was harmless beyond a reasonable doubt. 116 S.W.3d at 541-43. Because Edwards had testified in the guilt phase, and the jury was told that it could consider the guilt phase evidence in deciding punishment, the court reasoned that "the jury would not draw the same, almost automatic, negative inference from the fact that he did not testify in the penalty phase that it draws where a defendant fails to testify at all." *Id.* at 542. The court also reasoned that, given the jury's rejection of Edwards's guilt phase testimony that he was innocent, the jury would not have expected him to testify again in the penalty phase. *Id.* at 543.

Edwards claims that the Supreme Court of Missouri unreasonably applied *Chapman* and unreasonably determined the facts, because the court failed to consider the impact of the prosecutor's allegedly improper comment. Having already concluded that the state courts did not unreasonably apply federal law in rejecting Edwards's claim based on the prosecutorial argument, we likewise conclude that Edwards is not entitled to relief based on the state court's failure to consider the prosecutor's statement in its harmless error analysis.

-16-

The Supreme Court of Missouri determined that the trial court's failure to give a no-adverse-inference instruction was harmless under *Chapman*. *Edwards I*, 116 S.W.3d at 543. We will assume for the sake of analysis that the trial court's decision on the instruction was contrary to clearly established federal law. *Cf. Mitchell v. United States*, 526 U.S. 314, 329 (1999). In conducting harmless-error analysis in this § 2254 proceeding, however, we do not apply the "harmless beyond a reasonable doubt" standard of *Chapman*, but rather the "less onerous standard" set forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1993). *Fry v. Pliler*, 551 U.S. 112, 117 (2007). Under *Brecht*, habeas relief is proper only if an error had a substantial and injurious effect or influence in determining the jury's verdict. *See Brecht*, 507 U.S. at 637.

Essentially for the reasons given by the Supreme Court of Missouri, we conclude that the alleged error was harmless. In *Carter*, the Supreme Court explained that jurors "can be expected to notice a defendant's failure to testify, and, without a limiting instruction, to speculate about incriminating inferences from a defendant's silence." 450 U.S. at 304. While a jury might focus on a defendant's failure to testify in a case where the defendant does not testify at all, the risk is diminished in this case because Edwards did testify in the guilt phase of his trial.

During the guilt phase, the State presented evidence of two statements Edwards made to police shortly after Cantrell's death. In the first statement, Edwards confessed to hiring a man named "Mike" to kill Cantrell for $1,600. In the second, he provided additional details of Orthel Wilson's role in the scheme. Edwards then took the stand in his defense and denied any involvement in Cantrell's death. The jury rejected Edwards's testimony when it found that he arranged Cantrell's murder. Given the jury's finding that Edwards hired a man to kill his ex-wife, and its implicit disbelief of Edwards's denial on the witness stand, it is unlikely that the jury would expect Edwards to testify again in the penalty phase and that it would consider his failure to do so in reaching a decision.

-17-

The State made only a brief presentation during the penalty phase, calling two of Cantrell's siblings to testify about the impact of her death. Edwards countered with testimony from nine of his friends, family members, and coworkers. This context would not have led the jury to expect that Edwards would return to the stand. We agree with the Supreme Court of Missouri that "there is little more he could have said, except repeat a story the jury had already rejected and ask for mercy, and other witnesses asked for mercy on his behalf." *Edwards I*, 116 S.W.3d at 543. We thus conclude that the asserted error of the trial court in failing to give a no-adverse-inference instruction during the penalty phase did not have a substantial and injurious influence on the jury's verdict.

V.

Finally, Edwards appeals the district court's denial of his motion for funds to conduct a mental examination. This order denied "a motion to enlarge the authority of appointed counsel," *Harbison v. Bell*, 556 U.S. 180, 183 (2009), so we may consider it without a certificate of appealability.

In his habeas petition, Edwards claimed that he was incompetent to stand trial. Edwards's counsel, citing "difficulties in effectively communicating" with Edwards, also argued that Edwards "remains incompetent" to proceed in his habeas proceedings. While Edwards's petition was pending, his counsel sought funds under 18 U.S.C. § 3599(f) for Dr. William S. Logan to conduct a mental evaluation of Edwards to determine his competence to proceed with the habeas petition. The district court denied the motion, concluding that Edwards failed to show that funds for a mental examination were reasonably necessary.

A court may authorize defense counsel to obtain "investigative, expert, or other services" upon a finding that the services are "reasonably necessary for the representation of the defendant." 18 U.S.C. § 3599(f). Upon such authorization, the

court shall order the payment of fees and expenses for such services. *Id.* § 3599(f), (g)(2). Edwards bears the burden of establishing that the mental examination is reasonably necessary, *see United States v. Thurmon*, 413 F.3d 752, 755 (8th Cir. 2005), and we review the district court's decision for abuse of discretion. *See Fautenberry v. Mitchell*, 572 F.3d 267, 268 (6th Cir. 2009). This court has expressed doubts about whether a habeas petitioner has a statutory right to competence during habeas corpus proceedings. *See Paul v. United States*, 534 F.3d 832, 848 (8th Cir. 2008). *Cf. In re Gonzales*, 623 F.3d 1242 (9th Cir. 2010), *cert. granted*, 132 S. Ct. 1738 (2012) (No. 10-930); *Carter v. Bradshaw*, 644 F.3d 329, 336-37 (6th Cir. 2011), *cert. granted*, 132 S. Ct. 1738 (2012) (No. 11-218). But assuming for the sake of analysis that the right may exist, we conclude that the district court did not abuse its discretion in denying Edwards's motion.

In the motion, Edwards's counsel stated that they had reason to believe that Edwards's mental condition had deteriorated in the five years since a prior evaluation. Counsel explained that Edwards was continually involved in "petty feuds" with prison officials, causing him to spend a majority of his time in solitary confinement. Acknowledging that they are not "trained mental health professionals," Edwards's counsel stated their "belief" that a mental evaluation was "reasonably necessary" to determine Edwards's competence. Aside from these assertions, Edwards cited the "well-settled fact" that solitary confinement often causes a prisoner's mental state to deteriorate. As the district court noted, however, Edwards set forth no evidence regarding the circumstances of his confinement or their effect on his mental health. In the context of competency to stand trial, an attorney's "express doubt" of his client's competence, though relevant, is not alone sufficient to raise "sufficient doubt" to warrant a competency hearing. *Reynolds v. Norris*, 86 F.3d 796, 800 (8th Cir. 1996). We conclude that Edwards, relying on nothing more than his counsel's doubts about his competence, failed to meet his burden to show that a mental examination was reasonably necessary. The district court thus did not abuse its discretion in denying the motion for funds.

\*     \*     \*

The judgment of the district court is affirmed.  Edwards's motion to hold the appeal in abeyance is denied.

———————————————